



PILLSBURY WINTHROP LLP
One Battery Park Plaza
New York, New York 10004-1490
Tel:  (212) 858-1000
Fax:  (212) 858-1332
Leo T. Crowley (NDNY bar number 103706)

Attorneys for Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES, ex rel. MICHAEL BRANIGAN,<br><br>                         Plaintiff,<br><br>     -v-<br><br>BASSETT HEALTHCARE NETWORK, MARY IMOGENE BASSETT HOSPITAL, ANDREW RAUSCHER, M.D., JAMES ANANIA, M.D., PETER GENCARELLI, M.D., JONATHAN GREENBERG, M.D., TIMOTHY LANE, M.D., WILLIAM LEE, M.D., EDWARD PALMER, M.D., DEAN ROBINSON, M.D., L. MICHAEL NEWMAN, M.D., and other unknown defendants Does 1-20,<br><br>                        Defendants. | Civ. Action No. 5:02-CV-217 (NAM/GLS)<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

INTRODUCTION..............................................................................................1

STATEMENT OF FACTS...................................................................................1

A.    The Defendants........................................................................................1

B.    Branigan's Initial Complaint.....................................................................2

C.    Branigan's Amended Complaint.................................................................4

D.    Medicare Reimbursement for Anesthesia Services.........................................5

ARGUMENT..................................................................................................9

I.     BRANIGAN'S CONCLUSORY ALLEGATIONS DO
NOT SATISFY FED. R. CIV. P. 9(B)'S SPECIFICITY REQUIREMENT ...............9

A.    The Amended Complaint Fails to Identify Specific
Conduct Allegedly Committed by Particular Defendants..................................11

B.    The Information Provided to Branigan by the Government
Does Not Salvage His Flawed Pleading.......................................................12

C.    Rule 9(b) Should Be Strictly Applied to Branigan's Amended Complaint.................14

D.    If the Court Grants Leave to Replead, It Should Be Without Discovery....................16

II.    CLAIMS CONCERNING MEDICARE BILLS PAID PRIOR TO
FEBRUARY 19, 1996 AND THE CONSPIRACY CLAIM ARE TIME-BARRED....16

III.   CLAIMS CONCERNING MEDICARE BILLS PAID BETWEEN

FEBRUARY 19, 1996 AND MAY 2, 1997 ARE ALSO TIME-BARRED................18

A.    The 1996-97 Claims Are Time-Barred........................................................18

B.    *In the Alternative*, Medical Supervision and Personal Performance
Billing Claims From 1996-97 Are Time-Barred.............................................19

IV.   PLAINTIFF ALLEGES NO ACTIONABLE FALSE CLAIMS FROM
1998 FORWARD BECAUSE THE ALLEGED INACCURACIES HAD
NO EFFECT ON THE AMOUNT OF MEDICARE REIMBURSEMENT...............21

V.    THE MEDICAL SUPERVISION CLAIMS FAIL TO STATE A CLAIM.................24

CONCLUSION...............................................................................................25

## INTRODUCTION

The plaintiff is a former employee of the defendant hospital who now claims that virtually every anesthesia bill the hospital submitted to Medicare during his employment was fraudulent. He has brought the claims under the False Claims Act, 31 U.S.C. §3729, *et seq.* ("FCA") in the name of the United States. The FCA is a unique statute that encourages bounty hunting by individuals by giving them a cut of any settlement or judgment recovered on behalf of the government. Although the Department of Justice had the right to take over the prosecution of this case, it has declined to do so and the plaintiff is now proceeding on his own.

The case should be dismissed, or alternatively partial summary judgment entered, because: (i) the amended complaint fails to plead fraud with the requisite particularity (Fed. R. Civ. P. 9(b)); (ii) the statute of limitations has expired with respect to the first several years of Medicare billings charged in the amended complaint; (iii) no violation of the FCA could have occurred from 1998 forward because the alleged fraudulent statements had no effect on the amount of Medicare reimbursement for the services rendered; and (iv) as to one category of disputed bills, the plaintiff seeks to hold defendants accountable to a standard that does not exist in the regulations.

## STATEMENT OF FACTS

### A.    The Defendants

Defendant The Mary Imogene Bassett Hospital (the "Hospital") is a not-for-profit charitable corporation that operates a 180-bed, acute care inpatient teaching facility in Cooperstown, New York. Along with 24-hour emergency and trauma care, the Hospital provides comprehensive medical and surgical specialty care. The Hospital also operates

a large outpatient facility in Cooperstown and approximately 20 off-site health centers located throughout the Northern Catskills.[1]  It is also affiliated with two other hospitals, Bassett Hospital of Schoharie County, located in Cobleskill, and O'Connor Hospital, in Delhi.  Substantially all of the approximately 200 attending physicians at the Hospital, including the anesthesiologists named as defendants herein (the "Anesthesiologists"), are full-time salaried employees of the Hospital.[2]  Declaration of William Streck, dated August 11, 2003 ( "Streck Decl.") at ¶¶ 2-4.  These physicians do not bill Medicare or any other third-party payor.  Because they are salaried employees, they assign to the Hospital all rights to bill and collect.  Declaration of Nicholas Nicoletta, dated August 11, 2003 ("Nicoletta Decl.") ¶¶ 8-9.

The Hospital delivers anesthesia services through a team practice model that entails the participation of both anesthesiologists and certified registered nurse anesthetists ("CRNAs").  *Id.* at ¶ 5.

### B.    Branigan's Initial Complaint

On February 19, 2002, after his resignation from the Hospital, Plaintiff Michael Branigan ("Branigan") filed a complaint against the defendants (the "Initial Complaint") under seal, claiming, *inter alia*, that defendants violated the FCA by "submitting false and fraudulent claims to Medicare for the provision of anesthesia services which they did not perform." The crux of the Initial Complaint was that the Anesthesiologists generally failed to perform the so-called "seven steps [required under 42 C.F.R. § 405.552(a)] in

---

[1]  The Complaint names "Bassett Healthcare Network" as an additional separate defendant, but there is no such entity.  The Hospital has a filed d/b/a for the name Bassett Healthcare.  Streck Decl. ¶ 3.

[2]  The Hospital also from time to time makes use of locum tenens physicians, i.e. temporary substitutes.

2

order to qualify for billing for *medical direction* of an anesthesia procedure." Initial Complaint ¶ 22 (emphasis added).

Branigan did not specify any particular instances where the Hospital billed Medicare improperly for "medical direction"; nor did he claim to have had any involvement in the billing processes at the Hospital; nor did he claim that he ever actually saw any Medicare bills submitted by the Hospital.  Indeed, Branigan admitted that he needed to conduct discovery of the Hospital's files to identify Medicare cases over which to litigate.  Initial Complaint ¶25 (describing billing documentation that Branigan thought would back up his claims once obtained).  Nonetheless, Branigan alleged that the defendants:

> submitted approximately 5500 Medicare claims a year at an average of $300 per claim in which they falsely certified that they had "medically directed" anesthesia procedures.  In most cases, they had not satisfied any of the seven steps much less all of the seven steps.  Relator, himself, over a nine-year period, was personally present at approximately 3200 of these surgeries and actually performed the work that defendants later falsely billed.

Initial Complaint ¶24.  Branigan did not identify a single specific Medicare case where a failure to follow the seven steps actually occurred, much less a case where false billing actually resulted therefrom.

## C.     Branigan's Amended Complaint

On March 5, 2003, over a year after the Initial Complaint was filed, the government declined to intervene in the action.  On March 6, 2003, at the government's request, the Court ordered that the Initial Complaint be unsealed and served upon defendants.[3]  Branigan, however, did not serve the Initial Complaint upon defendants.

---

[3] *See* March 5, 2003 United States Notice of Election to Decline Intervention; March 6, 2003 Order of United States Magistrate Judge Gary L. Sharpe; Amended Complaint ¶5.

Rather, on May 23, 2002, he served an Amended Complaint, which incorporated billing records and other information which Branigan and/or his counsel had apparently obtained from the government. *See* Declaration of Maria T. Galeno, dated August 12, 2003, Ex. A (July 8, 2003 Letter from Branigan's counsel to defendants' counsel referring to "information that the Government supplied to us").

The Amended Complaint, like the Initial Complaint, asserts three general counts for violation of 31 U.S.C. §§ 3791(a)(1) (presentation of false claims); 3729(a)(2) (making false statements to get false claims paid by the government); and 3729(a)(3) (conspiracy to defraud). Unlike the Initial Complaint, however, which only raised claims for allegedly false bills for "medical direction," the Amended Complaint purports to state additional claims for false bills for "medical supervision" and "personal performance."

The Amended Complaint also includes a new paragraph 38. It asserts that on particular days, unnamed anesthesiologists billed Medicare for certain unspecified anesthesiology services which they allegedly did not perform and lists the aggregate amounts paid by Medicare, generally characterizing each such service as having been "falsely billed." Notwithstanding, however, the inclusion of the bulk billing detail in paragraph 38, the Amended Complaint still does not allege even one illustrative example of *how* any particular Anesthesiologist failed to meet the seven steps in any particular anesthesiology procedure, much less *how* or *why* any Medicare reimbursement claim by the Hospital for any such particular procedure was false. Rather, like the Initial Complaint, the Amended Complaint does not connect Branigan's generalized recollections about how anesthesiology procedures were performed – which are attributed *en masse* to all of the defendants without differentiation – to any personal knowledge

4

about specific false bills for specific procedures. There is no such connection for even one of the 3200 procedures in which Branigan claims he personally participated.

Notably, the Amended Complaint also does not allege:

- any bill for a patient who did not actually receive an anesthesia service;
- any bill that was "upcoded," i.e., coded with a more complex, higher priced service than the one actually performed;
- any bill to Medicare for a patient who was not a Medicare beneficiary;
- any CRNA functioning in excess of his or her scope of practice under state law and regulation governing anesthesia services; or
- any impact whatsoever on patient care.

In substance, the only issues raised in the Amended Complaint involve the allocation of bills as between the function of the CRNAs and the Anesthesiologists – all of whom are on the Hospital's payroll and none of whom actually receives the money that is collected for his or her services.

### D.   Medicare Reimbursement for Anesthesia Services

All of the Anesthesiologists and CRNAs at the Hospital are, and at all relevant times were, full-time salaried Hospital employees. The Hospital's CRNAs are all enrolled in Medicare, meaning that, like the Anesthesiologists, they can render a professional service in their own name which can be billed to Medicare. Both the Anesthesiologists and the CRNAs are members of the Bassett Physician Group, which consists of all physicians and midlevel providers who work for Bassett. (A mid-level provider is one who, although not a physician, by reason of training and certification is able to treat patients directly and receive payment for doing so; in addition to CRNAs, other types of mid-level providers include physicians' assistants and nurse midwives.) The Bassett Physician Group is not a corporate legal entity but is recognized by Medicare

5

as the provider, and has its own provider number, 70016A. The bills are rendered by the Hospital, not by individual physicians or CRNAs. Nicoletta Decl. ¶¶2-7.

The physicians and mid-level providers all assign to the Hospital their rights to payment. Accordingly, anesthesia services rendered to Medicare beneficiaries by members of the Bassett Physician Group are billed to Medicare by and in the name of the Bassett Physician Group, on behalf of the Hospital. *Id.* ¶¶ 7-8. The Medicare bills are submitted to the Hospital's Part B carrier, HealthNow, New York Inc. (Medicare is administered in part through private entities under contract to the government; Part B carriers review the claims and decide whether or not they are eligible for payment). All payments received go directly to the Hospital and not to the physician or mid-level provider who actually furnished the service. *Id.* ¶¶ 9-10.

Through the Hospital's team anesthesia model, certain components of anesthesia services are rendered by a CRNA and certain are rendered by an Anesthesiologist. The Medicare statute and regulations recognize a continuum of possible billing methods[4] for this model:

(i) *The services can be rendered by an anesthesiologist alone.* In this circumstance, a single bill is submitted to Medicare for the anesthesiologist's service, with the numerical code for the anesthesia service accompanied by the modifier AA. (*See* Medicare Carriers Manual § 4830 for a list of the relevant modifiers, a copy of which is included at Tab E of the Appendix, and 42 Fed. Reg. § 414.46 (Appendix Tab D)) For example, the procedure code 00840, when accompanied by the modifier AA,

---

[4] The descriptions in the text are for services to Medicare beneficiaries enrolled in traditional fee-for-service Medicare; for those enrolled in Medicare managed care plans, i.e., health maintenance organizations, payment is made by the plan in essentially the same way as for other enrollees in that plan, and the Medicare reimbursement formula is irrelevant.

tells the Part B carrier that the patient received an anesthesia service for lower abdominal surgery and that the service was performed by an anesthesiologist.  Medicare will then pay for that service in accordance with a fee schedule that prescribes a formula to calculate the appropriate reimbursement.[5]

(ii) *The service can be rendered by a CRNA without medical direction.*  In New York State, CRNAs have broad rights of practice in a hospital and can function under *de minimis* general supervision of a physician, without the physician even being an anesthesiologist.  10 NYCRR § 405.13(a)(1)(iv).  Where the service is for a CRNA alone, without medical direction, the procedure code bears the modifier QZ.  Significantly, at least from 1998 forward, such services are reimbursed by Medicare at the same rate that would apply if the service had been rendered by a physician alone.[6]

(iii) *The service can be performed by a "medically directed" CRNA and by a physician furnishing "medical direction."*  In such circumstances, two separate services are being rendered, each of which is separately billable to Medicare.  Broadly speaking, "medical direction" contemplates the CRNA being physically present and actually administering anesthesia, with the intermittent participation of a physician, who may be

---

[5] *See* Tab A of the Appendix, which consists of an excerpt from the Anesthesia Answer Book concerning this calculation.

[6] The Medicare rate is determined by the product of the number of units for a particular anesthesia service, multiplied by a dollar figure set annually, known as a conversion factor.  For confirmation that the units are calculated in the same fashion for CRNAs and anesthesiologists, see 42 C.F.R. § 414.46.  For confirmation that the conversion factors are identical, see: (i) for 2001, Program Memorandum: Carriers, Transmittal B-00-76, dated Dec. 22, 2000, (ii) for 2000, "Anesthesiologists/Certified Registered Nurse Anesthetists November 12, 1999" at http://www.umd.nycpic.com, (iii) for 1999, "Summary of Medicare Physician Fee Schedule Database Changes for 1999 at http://cms.hhs.gov/physicians/pfs/pfschang, and (iv) for 1998, see "1998 Allowances for Anesthesia Services" at http://www.empiremedicare.com/benenews/ brf1297/ane (collected at Appendix Tab B).

medically directing up to four concurrent procedures.[7]  The Medicare regulations describe the required involvement by a physician in such circumstances, including, for example, participation in induction and emergence.  Am. Compl. at ¶ 24.  If a Medicare patient receives services as "medically directed," then, from 1998 forward, the amount of payment that would be yielded if performed by either the physician or by the CRNA alone is divided in half, with half being paid for the CRNA's service, and half being paid for the physician's service.  In that circumstance, Medicare's Part B carrier actually receives two bills, with the bill for the physician bearing the modifier QK, and the bill for the CRNA bearing the modifier QX.  These modifiers tell the Part B carrier to pay each claim at 50% of the amount that would be payable for the physician alone.[8]  (Before 1998, the aggregate reimbursement in the case of "medical direction" was slightly higher than for a physician or CRNA alone).[9]

   (iv) *The service can be rendered by a CRNA with " medical supervision. "*   In the unusual circumstance that an anesthesiologist is responsible for more than four concurrent procedures, Medicare also recognizes two services to have been provided – that of the CRNA, which is paid at the same rate as if medically directed (QZ), and that of the anesthesiologist, which is paid at a lower rate than for "medical direction" (AD). The regulations state that this is applicable when there are more than four concurrent procedures and otherwise do not specify what the anesthesiologist must do under the rubric of medical supervision. *See* 42 C.F.R. § 414.46(e).

---

[7]  Due to a regulatory gap, prior to 1998 there was no express provision for medical direction of a single CRNA, so that medical direction as defined could only occur if there were two, three or four concurrent procedures.

[8]  42 C.F.R. § 414.46(d)(3).

[9]  *See* Appendix at Tab C for details.

Thus, in the first three circumstances – (i) anesthesiologist alone, (ii) CRNA alone, and (iii) medically directed, since 1998, Medicare has been paying the same amount. Where, as here, Medicare is billed by, and makes payment to, the same entity (*i.e.*, the Bassett Physician Group on behalf of the Hospital), the allocation of Medicare payments between the CRNA and the anesthesiologist is of no economic consequence to the government or the Hospital.

Moreover, where there is a team practice model, as at the Hospital, but for some reason one or more of the regulatory elements for "medical direction" are not satisfied, the government stated in the Federal Register in 2000: "We currently do not have a national policy that instructs the [Part B] carriers how to pay for a service when the anesthesiologist does not fulfill all of the elements of medical direction. One option [part B] carriers may use is to instruct the anesthesiologist to report this service as a reduced or unusual service and determine appropriate payment." 65 Fed. Reg. 44200 (July 17, 2000) (copy attached at Appendix Tab F). In the Federal Register article, the government solicited comments on a number of proposed payment methods. Significantly, the Hospital's Part B carrier made a policy pronouncement in 2000 that in cases of incomplete or failed medical direction the provider can bill the case as a non-medically directed CRNA service under the QZ modifier. Streck Decl., Ex. A. It reconfirmed this policy in August of this year. *Id.*, Ex. B.

## ARGUMENT

## I. BRANIGAN'S CONCLUSORY ALLEGATIONS DO NOT SATISFY FED. R. CIV. P. 9(B)'S SPECIFICITY REQUIREMENT

The Amended Complaint consists of a series of conclusory allegations that fall far short of satisfying the particularized pleading requirements of Rule 9(b) of the Federal

Rules of Civil Procedure.  FCA claims must comply with Rule 9(b)'s requirements for

pleading fraud.  *See Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476 (2d Cir. 1995),

*cert. denied*, 517 U.S. 1213 (1996).    Rule 9(b) requires:  "In all averments of fraud ...

the circumstances constituting fraud ... shall be stated with particularity."  Conclusory or

vague allegations will not suffice.  *See In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36,

40 (2d Cir. 2000); *United States ex rel. Phipps v. Comprehensive Community Dev. Corp.*,

152 F. Supp. 2d 443, 455 (S.D.N.Y. 2001).  A complaint must "(1) specify the statements

that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

when the statements were made, and (4) explain why the statements were fraudulent" to

satisfy Rule 9(b).  *Pilarczyk v. Morrison Knudsen Corp.*, 965 F. Supp. 311, 320

(N.D.N.Y. 1997) (citations omitted), *aff'd*, 162 F.3d 1148 (2d Cir. 1998).  *Accord Acito v.
IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995).

Standard notice pleading is not appropriate where, as here, there are accusations

of fraud that can impugn reputations and that threaten draconian damages and penalties.

*See United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp.2d 8, 18 n.12

(D.D.C. 2003) (Rule 9(b) serves "to discourage meritless fraud accusations, to prevent

serious damage to the reputation of the defending party from baseless claims, and to deter

claimants from adding fraud allegations to induce advantageous settlements").  *Accord
DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  Rule

9(b) is intended "'to eliminate fraud actions in which all the facts are learned through

discovery after the complaint is filed."  *United States ex rel. Vallejo v. Investronica, Inc.*,

2 F. Supp.2d 330, 338 (W.D.N.Y. 1998).  Rigid enforcement of Rule 9(b) is particularly

important in FCA actions because "[a] special relaxing of Rule 9(b) is a *qui tam*

10

plaintiff's ticket to the discovery process that the statute itself does not contemplate."

*United States ex rel. Russell v. Epic Healthcare Management Group*, 193 F.3d 304, 309

(5th Cir. 1999) (noting that there is a private right of action under the FCA only for

relators who already possess independent knowledge of fraud).

### A.     The Amended Complaint Fails to Identify Specific Conduct Allegedly Committed by Particular Defendants

Where, as here, a complaint asks multiple defendants "to respond to allegations of

fraud, the complaint should inform each defendant of the nature of his alleged

participation in the fraud." *DiVittorio*, 822 F.2d at 1247.  Yet Branigan attributes alleged

occurrences generically to the "defendants," "defendant anesthesiologists" or "defendant

hospitals" *en masse* throughout his Amended Complaint.  *See, e.g.*, Am. Compl. ¶ 25

("defendant anesthesiologists at the defendant hospitals did not perform pre-anesthesia

examinations and evaluations..."); *id.* ¶ 34 ("The defendant hospitals conspired with

defendant anesthesiologists to ensure that their false claims were not discovered").  In

none of these allegations does Branigan even attempt to identify a particular statement or

procedure on a specific date at a specific time in which a particular defendant was

involved.  Each allegation is devoid of the who, what, when and where that the law

requires.  *See Pilarczyk*, 965 F. Supp. at 320.  *Compare United States ex rel. Dhawan v.*

*New York City Health and Hosp. Corp.*, No. 95 Civ. 7649, 2000 WL 1610802, at *3

(S.D.N.Y. Oct. 27, 2000) (dismissing complaint under Rule 9(b) that relied on conclusory

statement to the effect that defendants could be lumped together for the purposes of

liability under the FCA), *aff'd sub nom United States v. New York Med. College*, 252

F.3d 118 (2d Cir. 2001); *United States ex rel. DeCarlo v. Kiewit/AFC Enter., Inc.*, 937 F.

Supp. 1039, 1050-51 (S.D.N.Y. 1996) (dismissing complaint under Rule 9(b) that

11

referenced defendants collectively and that failed to refer to specific employees who may have been involved in submitting false claims).

Indeed, in the only instance where Branigan bothers to mention a specific doctor by name, he again fails to provide any specifics of the alleged wrongful conduct. Branigan alleges that Dr. L. Andrew Rauscher, Chief of Anesthesiology, "on a periodic basis" gathered unspecified "anesthesia records," and instructed unspecified "anesthesiologists" to sign them at an unspecified time "long after the fact," and states that he is "aware of [unspecified] memoranda which document this process." Am. Compl. ¶ 34.

Branigan presumably relies upon this same paragraph 34 that mentions Dr. Rauscher to support his conspiracy claim. No other paragraph of the Amended Complaint even mentions the word "conspiracy." Branigan, however, may not "merely allude[] to an agreement between Defendants and ... not specify the particulars of how and when that alleged conspiracy arose." *United States ex rel. Capella v. Norden Sys., Inc.*, No 3:94 CV 2063, 2000 WL 1336487, at *11 (D. Conn. Aug. 24, 2000) (citing *Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 808 F. Supp. 213, 230 (S.D.N.Y. 1992) ("General allegations that defendants 'conspired' in an alleged scheme to defraud ... do not satisfy requirements of pleading fraud with particularity.")). Accordingly, the allegations in paragraph 34 discussed above do not state an FCA conspiracy claim. *Id.*

## B.   The Information Provided to Branigan by the Government Does Not Salvage His Flawed Pleading

Tacitly conceding the insufficiency of the allegations in the Initial Complaint, which resorted to the deficient allegations discussed above for all of its operative averments, Branigan amended the complaint before serving any pleading on the

defendants. In the Amended Complaint, he added a paragraph based wholly on information provided by the government. *See* Am. Compl. ¶ 38. That paragraph, setting forth claims totaling $17,133.76 in an Amended Complaint seeking damages of over $276,000,000, itself lacks the necessary specificity.

In paragraph 38, Branigan adds only conclusory assertions that on certain dates, unspecified procedures performed by particular unnamed providers were "[f]alsely billed." Branigan does not claim to have been the CRNA on those cases, or that he was even at the Hospital on those days. Although Rule 9(b) requires him to "explain why the statements were fraudulent," *Pilarczyk*, 965 F. Supp. at 320, he provides no detail as to how or why any of the referenced bills in paragraph 38 were false. Instead, Branigan implicitly, though not expressly, alleges that each modifier was wrong without stating why or what other modifier should have been used. The allegations, in pertinent part, fail to:

- specify which of the seven conditions for medical direction reimbursement were supposedly not met;

- allege that any unmet criteria for medical direction were not justified under Medicare regulations that permit anesthesiologists to address emergencies for other patients; or

- allege how the service should have been billed and whether a different modifier would have affected the amount of reimbursement paid to the Hospital.

Branigan thus provides no theory of his case against the challenged bills to which the defendants may respond. *See, e.g., Pilarczyk*, 965 F. Supp. at 321 (dismissing complaint and denying leave to re-plead where plaintiffs, *inter alia*, did not "explain in what respects the statements at issue were false"); *United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 147 (D. Mass. 2000) (dismissing amended complaint with prejudice which, "in essence, sets out a methodology by which [defendants] *might*

have produced false invoices, which in turn *could* have led to false claims.") (emphasis added).  Moreover, Branigan's failure in paragraph 38 to identify by name any doctor or the CRNA allegedly present during the procedures underscores his lack of any actual knowledge that any of the referenced bills are false.  A plaintiff cannot satisfy Rule 9(b) by "bas[ing] claims of fraud on speculation and conclusory allegations."  *United States ex rel. Russell*, 193 F.3d at 308; *see also United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, No. Civ. A. 01-10583-DPW, 2003 WL 21228801, at *4 (D. Mass. May 21, 2003) (noting that fraud claims may not be "based upon speculation or conclusory allegations, but fact").

### C.    Rule 9(b) Should Be Strictly Applied to Branigan's Amended Complaint

Branigan has failed to satisfy even the most basic specificity standards for Rule 9(b).  Yet courts demand a high degree of specificity from plaintiffs like Branigan.  Specifically, Branigan enjoys superior access to information with which to plead his claims as a result of the 3200 procedures that he purportedly witnessed and the many thousands of billing records that the government supplied before declining to pursue this action in its own name.[10]  *See* Am. Compl. ¶¶ 26, 38.

Despite these advantages, nowhere does Branigan connect a single procedure that he claims to have witnessed with a subsequent false bill to Medicare.  Branigan alleges that the seven conditions for billing for medical direction were not satisfied routinely, *see*

---

[10] Greater precision is required from relators who already have access to information on their claims as the result of prior discovery.  *See United States ex rel. Dhawan v. New York City Health and Hosp. Corp.*, No. 95 Civ. 7649, 2000 WL 1610802, at *2 (S.D.N.Y. Oct. 27, 2000) ("[A] 'greater precision' is required when discovery has been had in a prior case." ); *United States ex rel. DeCarlo v. Kiewit/AFC Enter., Inc.*, 937 F. Supp. 1039, 1050 (S.D.N.Y. 1996) (finding that greater precision was required in the complaint of a relator who had the benefit of discovery in a prior, related action).  Although no formal discovery has occurred here, the government has apparently voluntarily supplied Branigan with records.

14

Am. Compl. ¶ 25; yet, nowhere does he describe a specific procedure in which some or all of the seven conditions for medical direction were not satisfied that was nonetheless billed as medically directed.  Likewise, although Branigan asserts generally that defendants did not meet the additional requirements for billing a procedure as personally performed "in each of the personal performance cases at issue here," Am. Compl. ¶ 30, he does not describe a single instance in which he witnessed a specific procedure that was staffed in a manner that did not justify a subsequent personal performance bill.  Indeed, such sweeping allegations that every Medicare bill submitted over an eleven-year period was false are so overstated as to be tantamount to a concession of a lack of personal knowledge regarding the challenged bills.

Nor can Branigan avoid supplying the specificity that Rule 9(b) requires by complaining that the alleged fraudulent scheme involves many claims that were submitted over a long period of time.  Branigan cannot "evade the command of Rule 9(b) by relying upon the complexity of the edifice which he created." *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 198 F.R.D. 560, 563 (N.D. Ga. 2000), *aff'd*, 290 F.3d 1301 (11th Cir. 2002).  Nor can Branigan obtain a relaxed application of Rule 9(b) by asserting that he cannot provide the requisite specificity because facts are "peculiarly within the opposing party's knowledge." *DiVittorio*, 822 F.2d at 1247. Relators in Medicare billing cases are not entitled to the relaxed standard "because documents containing the requisite information [are] possessed by other entities, such as the Healthcare Financing Administration." *United States ex rel. Russell*, 193 F.3d at 308; *see also United States ex rel. Karvelas*, 2003 WL 21228801, at *5 (same).  Accordingly,

15

the Amended Complaint must be dismissed in its entirety for its failure to plead fraud with the requisite specificity.

### D.   If the Court Grants Leave to Replead, It Should Be Without Discovery

Branigan should not be permitted to take discovery to frame a third pleading.  To do so would subvert the gatekeeping function of Rule 9(b).  "Directly put, the who, what, when, and where [of claimed fraud] must be laid out *before* access to the discovery process is granted."  *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) (emphasis in original); *see also Heller v. Rothschild*, 631 F. Supp. 1422, 1424 (S.D.N.Y. 1986) ("Discovery in aid of fleshing out a pleading alleging fraud is not favored.").  Discovery in aid of repleading is not appropriate since Rule 9(b) is intended "to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed."  *United States ex rel. Vallejo*, 2 F. Supp.2d at 338.

### II.   CLAIMS CONCERNING MEDICARE BILLS PAID PRIOR TO FEBRUARY 19, 1996 AND THE CONSPIRACY CLAIM ARE TIME-BARRED

Branigan's claims concerning Medicare bills allegedly paid prior to February 19, 1996, are barred by the statute of limitations and must be dismissed.  In a *qui tam* action in which the government has declined to intervene, the relator must bring suit within six years of the alleged violation.  *See United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 6 F. Supp. 2d 263, 265 (S.D.N.Y. 1998) ("the clear statutory language" of 31 U.S.C. § 3731(b) limits relators to bringing claims going back six years).

Branigan will likely attempt to claim the benefit of the three-year tolling provision set forth in 31 U.S.C. § 3731(b)(2) for frauds that remain undisclosed, but two courts in the Second Circuit and several other courts that have addressed the issue have rejected

the notion that this provision applies to *qui tam* relators in actions in which the government declines to intervene. *See United States ex rel. Thistlethwaite*, 6 F. Supp. 2d at 265; *United States ex rel. Capella*, 2000 WL 1336487, at *12; *United States ex rel. Drake v. Norden Sys., Inc.*, No. 3:94-CV-963 (EBB), 2000 WL 1336497, *13 (D. Conn. Aug. 24, 2000); *United States ex rel. Fisher v. Network Software Associates, Inc.*, 180 F. Supp. 2d 192, 194 (D.D.C. 2002); *United States ex rel. El Amin v. George Washington University*, 26 F. Supp. 2d 162, 173 (D.D.C. 1998).[11]

Under the False Claims Act, a "violation" is said to occur – and the statute of limitations begins to run – when the government makes payment on a false claim. *See United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993). A *qui tam* action is deemed filed for purposes of the statute of limitations on the date that the relator files his complaint with the government under seal. *See* 2 John T. Boese, Civil False Claims and Qui Tam Actions § 5.02[B][4] (2d ed. Supp. 2003-2) (citing *United States ex rel. Goodstein v. McLaren Reg'l Med. Ctr.*, No. 97-CV-72992-DT, 2001 U.S. Dist. LEXIS 2917, at *11 (E.D. Mich. Jan. 3, 2001); *United States ex rel. Costa v. Baker & Taylor, Inc.*, No. C-95-1825-VRW, 1998 WL 230979, at *3 (N.D. Cal. Mar. 20, 1998)). Here, Branigan filed his complaint in this action on February 19, 2002. Accordingly, claims alleged in Counts I and II concerning allegedly false Medicare bills paid before February 19, 1996, are time-barred.

---

[11] The Northern District of New York has not specifically addressed whether the three-year tolling provision of 31 U.S.C. § 3731(b)(2) applies to relators where the government has declined to intervene. In *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 777 F. Supp. 195, 200 (N.D.N.Y. 1991), *aff'd*, 985 F.2d 1148 (2d Cir. 1993), the parties did not dispute that the three-year tolling provision applied to relators, and effectively stipulated to its applicability. Thus, the Court was able to decide the case – ultimately dismissing it on statute of limitations grounds – *assuming* the applicability of this three-year tolling provision to relators without adjudicating the issue.

Branigan's conspiracy claim in Count III does not specify when the supposed conspiracy was formed. Branigan suggests, however, that any alleged conspiracy stretches back at least 10 years. *See* Am. Compl. ¶ 34. A claim concerning any such alleged conspiracy is thus time-barred because the statute of limitations for conspiracy in the civil false claims context is triggered by the very formation of the conspiracy, rather than by the last overt act. *See Blusal Meats, Inc. v. United States*, 638 F. Supp. 824, 829 (S.D.N.Y. 1986) ("The fact that acts in furtherance of the conspiracy alleged in this case may have occurred within six years of the … suit does not alter the application of the limitations period to the 3729(a)(3) [conspiracy] claim."), *aff'd* 817 F.2d 1007 (2d Cir. 1987). Branigan's conspiracy claim is therefore time-barred.

## III.   CLAIMS CONCERNING MEDICARE BILLS PAID BETWEEN FEBRUARY 19, 1996 AND MAY 2, 1997 ARE ALSO TIME-BARRED

### A.   The 1996-97 Claims Are Time-Barred

Branigan's claims related to Medicare bills submitted between February 19, 1996 (six years before he filed the Initial Complaint) and May 2, 1997 (six years before he filed the Amended Complaint) – hereinafter, the "1996-97 Claims" – are time-barred as well, because his Amended Complaint does not relate back to the date of filing of his Initial Complaint. Fed. R. Civ. P. 15(c) provides, in relevant part: "An amendment of a pleading relates back to the date of the original pleading when … the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."

The key issue is whether "the [Initial] Complaint gave the Defendant adequate notice of what must be defended against in the Amended Complaint." *In re Bennett Funding Group,* 275 B.R. 447, 451 (Bankr. N.D.N.Y. 2001) (citations omitted). Where,

18

as stated above, the Initial Complaint did not satisfy Rule 9(b) – and therefore did not

provide the heightened notice required for the type of fraud claims asserted therein -- it is

axiomatic that it did not provide adequate notice within the meaning of Rule 15(c).  If a

claim is subject to heightened pleading requirements, an amended pleading cannot relate

back to an initial pleading which failed to meet them.  *See, e.g., In re Perez*, 173 B.R.

284, 289-92 (Bankr. E.D.N.Y. 1994) (second amended complaint alleging fraud claims

that were not dischargeable by bankrupt entity did not relate back to prior fraud

complaint which was dismissed for failure to comply with Rule 9(b)).[12]  Thus, where, as

here, the Initial Complaint fails to pass Rule 9(b) muster, then the Amended Complaint

cannot relate back, and the 1996-97 Claims must be dismissed as time-barred.  This is the

case whether or not the Amended Complaint satisfies Rule 9(b), as "information provided

by the parties in papers subsequently filed with the Court generally is not to be

considered in its determination of whether there has been adequate notice."  *In re Bennett*

*Funding Group,* 275 B.R. at 451.

**B.      *In the Alternative*, Medical Supervision and Personal Performance Billing Claims From 1996-97 Are Time-Barred**

Whether or not the Initial Complaint passes Rule 9(b) muster, certain of the 1996-

97 Claims (relating to medical supervision and personal performance billing) nonetheless

would not relate back to the Initial Complaint because they do not "ar[i]se out of the

conduct, transaction, or occurrence set forth or attempted to be set forth in the original

---

[12] *See also Federal Deposit Ins. Corp. v. Chizner*, 110 F.R.D. 114, 119 (E.D.N.Y. 1986) (amended complaint adding claims for default on two notes did not relate back to claim for non-payment of three other notes allegedly executed in connection with same transaction because "plaintiff was required to plead each note separately and with specificity" when filing original complaint); *United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-CV-2063 (EBB), 2000 WL 1336487, at *12 (D. Conn. August 24, 2000) (implicitly denying relation back of second amended complaint to prior complaint in FCA case by holding, on statute of limitations grounds: "Relator may only adduce evidence of falsity for [false] claims submitted after [date six years prior to date of initial complaint]")

pleading." Fed. R. Civ. P. 15(c). In the Initial Complaint, the only category of services

complained about were for "medical direction." The claims concerning "personal

performance" and "medical supervision" were raised for the first time in the Amended

Complaint. As such, the 1996-97 Claims to the extent they relate to medical supervision

and personal performance billing, and not medical direction billing, must be dismissed as

time-barred.

In analogous FCA cases, courts have denied relation back for this reason.[13]

Indeed, one court in the Second Circuit has specifically held that even where an initial

complaint satisfied Rule 9(b) as to one fraud, the amended complaint did not relate back

to the initial complaint with respect to a new fraud where the "fraudulent conduct in the

proposed amended complaint represents separate alleged acts of fraud."[14] This is true

whether or not the amended complaint satisfies Rule 9(b) as to a new fraud. Such is

precisely the case with respect to Branigan's medical supervision and personal

performance billing claims.

---

[13] *See, e.g., United States v. Cripps*, 451 F. Supp. 598, 599-601 (E.D. Mich. 1978) (no relation back where amended complaint sought damages for 71 home-building projects obtained by collusive bidding, while initial complaint only sought damages for 47 because "each separate act of fraud would be separately punishable and the statute of limitations would begin to run separately as to each act.... The addition of an overt act gives rise to a separate cause of action and does not relate back to the time of filing of the original complaint"); *United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 14-15 (D.D.C. 2003) (no relation back of claim of illegal kickbacks by hospital to physicians in exchange for referrals to initial claims of fraudulent procurement of accreditation and fraudulent accounting practices to increase Medicare reimbursement bases because initial allegations "involv[ed] distinct facts and allegations from the kickback claims"); *United States. ex rel. Colunga v. Hercules, Inc.*, No. 89-CV-954B, 1998 WL 310481, at *1-2 (D. Utah. March 6, 1998) (no relation back of claims related to improper servicing of missile systems to initial and prior amended claims related to other missile systems serviced by defendant government contractor).

[14] *Bank Brussels Lambert v. Chase Manhattan Bank*, No. 93 Civ. 5298 (LMM), 1999 WL 672302, at *6 (S.D.N.Y. August 27, 1999) (citations and internal quotations omitted) (denying relation back of amended claims despite "[t]he fact that fraudulent conduct other than that specifically alleged in the original complaint may, *arguendo*, be said to involve exactly the same type of misrepresentations as those pled in the original Complaint.... It is too much of a leap to say that a fraud, thus alleged with particularity [in the original complaint], gives notice of another fraud, not alleged with particularity or otherwise [in the original complaint].") (citations and internal quotations and punctuation omitted).

**IV.  PLAINTIFF ALLEGES NO ACTIONABLE FALSE CLAIMS FROM 1998 FORWARD BECAUSE THE ALLEGED INACCURACIES HAD NO EFFECT ON THE AMOUNT OF MEDICARE REIMBURSEMENT**

Branigan alleges, in substance, that the defendants failed to disclose to the government that the anesthesia services were rendered principally by CRNAs, rather than by the Anesthesiologists.  From 1998 forward, however, Medicare would have paid *precisely the same amount* as it paid under the allegedly fraudulent bills if the Hospital had used modifiers to show that CRNAs, not Anesthesiologists, performed the anesthesia services, as Branigan intimates it should have.  Thus, because the government would not have acted any differently if the services had been billed as entirely performed by CRNAs, no violation of the FCA occurred.

Branigan's principal allegation is that the Hospital billed Medicare for "medically directed" anesthesia services when the seven requirements for "medical direction" were not met.  Am. Compl. ¶¶ 24-26, 38.  Under such circumstances, the government has announced that it has no national policy to instruct Medicare carriers as to how to pay for the service.  *See* 65 Fed. Reg. 65413 (July 17, 2000).  The Hospital's Medicare carrier, however, does provide instruction, stating that where the seven requirements for medical direction are not met, the service should be billed under the QZ modifier, to signify a CRNA alone without medical direction.  Streck Aff., Exs. A, B.  Since 1998, Medicare pays the *identical* amount for services billed as "medically directed" (modifiers QK for the anesthesiologist and QX for the CRNA) as for "CRNA alone without medical direction" (modifier QZ).  *See* Statement of Facts, Section D *supra*.

Branigan also alleges that the Hospital billed Medicare for "personal performance" by an anesthesiologist when the requirements for personal performance were not met (i.e., the seven requirements for medical direction, in addition to the

21

anesthesiologist either "personally performing the entire anesthesia procedure" or being "continuously involved in a single case" involving a CRNA).  Am. Compl. ¶¶ 27-30, 38. Under such circumstances, once again, the service otherwise could have been billed as CRNA alone without medical direction (modifier QZ), entitling the Hospital, since 1998, to an *identical* payment as it was allegedly paid for "personal performance" (modifier AA).[15]

In view of the lack of any difference between the Medicare payment to the Hospital for a CRNA only service, relative to a service that is either medically directed or personally performed by an anesthesiologist, Branigan cannot satisfy the critical element of an FCA claim -- that the allegedly incorrect statement induced a payment that the government otherwise would not have made.  Courts have used different labels to describe this critical element:  (i) causation -- whether the false statement *caused* a loss; (ii) reliance -- whether the government *relied* on the false statement in making its payment; (iii) materiality -- whether the false statement was *material* to the government's decision to pay; or (iv) falsity -- whether the claim was legally "*false*" within the meaning of the FCA or simply non-actionable regulatory non-compliance.  Whatever the label applied, there can be no FCA liability without this element.

The Second Circuit has followed this rationale, using the "falsity" approach noted above, concluding that the term "false claim" under the FCA has a special meaning, and only covers "improper claim[s] aimed at extracting money the government *otherwise*

---

[15] Branigan also complains of bills to Medicare for "medically supervised" procedures, arguing that the seven requirements for medical direction must also be met for medical supervision cases.  Am. Compl. ¶¶ 31-32, 38.  Branigan's argument is simply wrong based on the plain language of the regulation.  *See* Section V *infra*.  In addition, Branigan fails to provide any specifics or any allegations as to how the "medically supervised" procedures should have been billed.  Accordingly, defendants are unable to respond whether the government sustained any economic impact from the allegedly false "medical supervision" bills.

*would not have paid." Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001) (emphasis

added).  The Court further held that "not all instances of regulatory noncompliance will

cause a claim to become false," and explained its rationale as follows:

> Since the Act is restitutionary and aimed at retrieving ill-begotten funds, it
> would be anomalous to find liability when the alleged noncompliance
> would not have influenced the government's decision to pay ... [The Act]
> does not encompass those instances of regulatory noncompliance that are
> irrelevant to the government's disbursement decisions.

*Id.* at 697.[16]  Other courts, employing essentially the same analysis but applying a

"materiality" label, have required FCA plaintiffs to show that allegedly false claims

influenced the government's decision to pay, and reached similar conclusions as did the

Second Circuit.[17]  The cases that have labeled their analysis as "reliance" or "causation"

---

[16] *Cf., Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 563-65 (8th Cir. 1997) (in "reverse false claim" case, where claim was based on false statement to conceal an allegedly triggered obligation to indemnify the Pension Benefit Guaranty Corporation ("PBGC"), no FCA liability because relator failed to show that full disclosure would have altered PBGC's decision not to assert its indemnity rights at the time of the alleged non-disclosure); *United States ex rel. Wilkins v. North American Constr. Corp.*, 173 F. Supp. 2d 601, 636 (S.D. Tex. 2001) (no FCA liability for bid-padding by successful lowest bidder for government drilling contract because no allegation that a reasonable government agency would not have awarded bid had the true facts been disclosed in the bid; under FCA "the court compares the actions of a reasonable agency confronted with true statements with the actions of a reasonable agency confronted with the allegedly false statements and determines if there is a difference").

[17] *See, e.g., United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 679 (5th Cir. 2003) (Jones, J., concurring) ("[T]here should no longer be any doubt that materiality is an element of a civil False Claims Act case.  Our past precedent and every circuit that has addressed the issue have so concluded.").  *See also United States v. Data Translation, Inc.*, 984 F.2d 1256, 1267 (1st Cir. 1992) (ruling that a false statement that was not material did not give rise to liability under the Act); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-733 (7th Cir. 1999) (affirming dismissal of *qui tam* claims because relator failed to demonstrate that the omission of a particular test "was material to the United States' buying decision"); *United States ex rel. Sharp v. Consolidated Med. Transport, Inc.*, No. 96 C 6502, 2001 WL 1035720, at *10 (N.D. Ill. Sept. 4, 2001) ("[O]nly those complaints which allege that, the government would not have paid the claim had it known about the underlying violation, present a valid cause of action under the FCA ... If the certification in question has no bearing on the government's decision to pay the claims, there is no reason why it should trigger liability under the FCA."); *see also* 1 John T. Boese, *Civil False Claims and Qui Tam Actions*, § 2.03 A (2d ed. Supp. 2003-2) (while the Second Circuit did not address the materiality requirement, "the court's analysis [in *Mikes*] strongly supports the conclusion" that there is a materiality requirement in the Second Circuit).

also reach the same conclusion.[18]  Under the "falsity" analysis of *Mikes*, and supported by alternatively labeled tests of the other circuits, to establish FCA liability, Branigan must show that the government "otherwise would not have paid" the amounts that it furnished. 274 F.3d at 696.  For claims from 1998 forward, he has not, and cannot, do so.

## V.  THE MEDICAL SUPERVISION CLAIMS FAIL TO STATE A CLAIM

At paragraph 32 of the Amended Complaint, Branigan asserts the sole basis of his medical supervision claim: that "[i]n .. medical supervision situations, the anesthesiologist is still required to perform the seven steps required by Medicare to be paid for medical direction, including, but not limited to, 'induction' and 'emergence'." This is simply wrong.  No provision of the Medicare reimbursement regulations requires an anesthesiologist to satisfy the seven steps in order to be paid for medical supervision, *see* 42 C.F.R. § 414.46(e), and Branigan has not even attempted to identify one in his Amended Complaint.  As such, even if the anesthesiologists failed to follow the seven steps in medical supervision situations, Branigan has not stated a claim that such cases were incorrectly billed.

---

[18]  *See, e.g., United States v. Hibbs*, 568 F.2d 347, 351 (3rd Cir. 1977) (requiring showing of causation for liability to attach under the Act, finding no liability where false certifications were made in obtaining mortgage financing because "precisely the same loss would have been suffered by the government had the certifications been accurate and truthful").

## **CONCLUSION**

For the foregoing reasons, defendants' motion should be granted.

Dated: New York, New York
August 12, 2003

PILLSBURY WINTHROP LLP

By: _____
Leo T. Crowley (NDNY bar number 103706)

One Battery Park Plaza
New York, New York 10004-1490
Tel:  (212) 858-1000
Fax:  (212) 858-1500

Attorneys for Defendants

Of counsel:
Maria T. Galeno
Daniel Z. Mollin

25

PILLSBURY WINTHROP LLP
One Battery Park Plaza
New York, New York 10004-1490
Tel:  (212) 858-1000
Fax:  (212) 858-1332
Leo T. Crowley (NDNY bar number 103706)

Attorneys for Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES, ex rel. MICHAEL BRANIGAN,<br><br>                              Plaintiff,<br><br>        -v-<br><br>BASSETT HEALTHCARE NETWORK, MARY IMOGENE BASSETT HOSPITAL, ANDREW RAUSCHER, M.D., JAMES ANANIA, M.D., PETER GENCARELLI, M.D., JONATHAN GREENBERG, M.D., TIMOTHY LANE, M.D., WILLIAM LEE, M.D., EDWARD PALMER, M.D., DEAN ROBINSON, M.D., L. MICHAEL NEWMAN, M.D., and other unknown defendants Does 1-20,<br><br>                              Defendants. | Civ. Action No. 5:02-CV-217 (NAM/GLS)<br><br>**SERVICE CERTIFICATE** |

STATE OF NEW YORK        )

COUNTY OF NEW YORK    )

       Eric T. Streck, being duly sworn, deposes and says:

       1.     I am over 18 years of age, am employed as an associate attorney by the law firm of Pillsbury Winthrop, LLP.  I am not a party to this action.

       2.     On August 12, 2003, I caused true and correct copies of the documents listed below in paragraph 3 to be served by FedEx overnight delivery on counsel to

Plaintiff/Relator and on counsel to the United States of America at the following addresses:

> Boies Schiller & Flexner, LLP
> David S. Stone, Esq.
> 150 JFK Parkway
> Suite 100
> Short Hills, New Jersey 07078

> Attorneys for Plaintiff/Relator Michael Branigan

> Paula Ryan Conan, Esq.
> Assistant U.S. Attorney for the Northern District of New York
> P.O. Box 7198
> 100 S. Clinton Street
> Syracuse, New York 13261-7198

> Attorneys for the United States of America

3.   True and correct copies of the following documents were served as set forth above in paragraph 2:

a.   Defendants' Notice of Motion to Dismiss or, in the Alternative, for Partial Summary Judgment;

b.   Memorandum of Law in Support of Defendants' Motion to Dismiss or, in the Alternative, for Partial Summary Judgment and appendix thereto;

c.   Defendants' Statement of Material Facts;

d.   Declaration of William Streck, M.D., dated August 11, 2003;

e.   Declaration of Nicholas Nicoletta, dated August 11, 2003; and

f.   Declaration of Maria T. Galeno, dated August 12, 2003.

_____
ERIC T. STRECK

Sworn to before me this
13th day of August, 2003

_____
Notary Public

MAE B. GARDINE
Notary Public, State of New York
No. 24-4695312
Qualified in Kings County
Certificate filed in New York County
Commission Expires March 30, 20___

300083249v1                                    2