



PILLSBURY WINTHROP LLP
One Battery Park Plaza
New York, New York 10004-1490
Tel:  (212) 858-1000
Fax:  (212) 858-1332
Leo T. Crowley (NDNY bar number 103706)

Attorneys for Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES, ex rel. MICHAEL
BRANIGAN,

                Plaintiff,

      -v-

BASSETT HEALTHCARE NETWORK,
MARY IMOGENE BASSETT
HOSPITAL, ANDREW RAUSCHER,
M.D., JAMES ANANIA, M.D., PETER
GENCARELLI, M.D., JONATHAN
GREENBERG, M.D., TIMOTHY LANE,
M.D., WILLIAM LEE, M.D., EDWARD
PALMER, M.D., DEAN ROBINSON,
M.D., L. MICHAEL NEWMAN, M.D.,
and other unknown defendants Does 1-20,

                Defendants.

Civ. Action No. 5:02-CV-217 (NAM/GJD)

**REPLY MEMORANDUM IN
FURTHER SUPPORT OF
DEFENDANTS' MOTION TO
DISMISS OR, IN THE
ALTERNATIVE, FOR PARTIAL
<u>SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

ARGUMENT ................................................................................................................1

I.   DEFENDANTS' PARTIAL SUMMARY JUDGMENT MOTION
     FOR CLAIMS FROM 1998 FORWARD SHOULD BE GRANTED..........................1

II.  STATUTE OF LIMITATIONS BARS PLAINTIFF'S CLAIMS IN PART.................4

III. BRANIGAN FAILS TO COMPLY WITH RULE 9(b).................................................6

IV. THE MEDICAL SUPERVISION CLAIMS FAIL TO STATE A CLAIM..................9

CONCLUSION..................................................................................................................10

# TABLE OF AUTHORITIES

## CASES

*Acito v. IMERCA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995)......................................................................................9

*Adams v. New York State Thruway Authority*,
   No. 97-CV-1909, 2001 WL. 874785 (N.D.N.Y. March 22, 2001)...............................2

*Alfaro v. E.F. Hutton & Co. Inc.*,
   606 F. Supp. 1100 (E.D. Pa. 1985) .........................................................................5

*Banks v. Mannoia*,
   890 F. Supp. 95 (N.D.N.Y. 1995)........................................................................1, 2

*Blusal Meats, Inc. v. U.S.*,
   638 F. Supp. 824 (S.D.N.Y. 1986), *aff'd*, 817 F.2d 1007 (2d Cir. 1987) .....................6

*Contemporary Mission, Inc. v. United States Postal Serv.*,
   648 F.2d 97 (2d Cir. 1981)......................................................................................2

*DiVittorio v. Equidyne Extractive Industrial, Inc.*,
   822 F.2d 1242 (2d Cir. 1987)..................................................................................9

*Epstein v. Haas Sec. Corp.*,
   731 F. Supp. 1166 (S.D.N.Y. 1990)........................................................................5

*Holdridge v. Heyer-Schulte Corp.*,
   440 F. Supp. 1088 (N.D.N.Y. 1977)........................................................................5

*Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*,
   891 F.2d 414 (2d Cir. 1989)...................................................................................2

*Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001)................................................................................2, 3

*Minnesota Ass'n of Nurse Anesthetists v. Allina Health Systems Corp.*,
   276 F.3d 1032 (8th Cir. 2002) ................................................................................3

*Siegel v. Converters Transport, Inc.*,
   714 F.2d 213 (2d Cir. 1983)...................................................................................5

*United States ex rel. Capella v. Norden Sys., Inc.*,
   No. 3:94-CV-2063, 2000 WL. 1336487 (D. Conn. 2000)...........................................4

*United States ex rel. DeCarlo v. Kiewit/AFC Enterprise, Inc.*,
   937 F. Supp. 1039 (S.D.N.Y. 1996)........................................................................6

*United States ex rel. Minnesota Association of Nurse Anesthetists v. Allina
Healthcare System Corp.*,
    Civ. No. 4-96-734, 1997 U.S. Dist. LEXIS 21402 (D. Minn. March 3, 1997) .............7

*United States ex rel. Ortega v. Columbia Healthcare, Inc.*,
    240 F. Supp. 2d 8 (D.D.C. 2003) ................................................................................8

*United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*,
    6 F. Supp. 2d 263 (S.D.N.Y. 1998) ...........................................................................4

*United States ex rel. Vallejo v. Investronica, Inc.*,
    2 F. Supp. 2d 330 (W.D.N.Y. 1998) ..........................................................................8

*United States v. Centracare Health System, Inc.*,
    2002 WL. 1285089 (D. Minn. 2002) ..........................................................................8

## STATUTES

31 U.S.C. § 3731(b)(2) ....................................................................................................4, 5

48 Fed. Reg. 8927 (March 2, 1983) ..................................................................................9

42 C.F.R. § 405.552(b) ....................................................................................................9

42 C.F.R. § 414.46(e).......................................................................................................9

H.R. Conf. Rep. No. 103-213 at 764-65 (1993), *reprinted in* 1993 U.S.C.C.A.N.
    1453-54 .......................................................................................................................3

## OTHER AUTHORITIES

1 Medicare & Medicaid Guide ¶¶ 3110, 3185, 3451, (CCH) ...............................................9

Medicare Carriers Manual § 8313I......................................................................................9

Medicare Provider Reimbursement Manual § 2182.8G .......................................................9

## INTRODUCTION

Relator Branigan characterizes himself as a "whistleblower," but his invective is more consistent with that of a vengeful former employee without bona fide claims.  The False Claims Act (the "FCA") is a unique law that imposes unique requirements on plaintiffs, because of the draconian remedies potentially available.  The questions raised by his complaint have nothing to do with clinical or patient care issues; they are technical ones under Medicare billing regulations.[1]

Because Branigan in effect concedes the factual basis for the prong of defendants' motion seeking partial summary judgment as to claims for 1998 forward, we begin with that issue.  We then take up the statute of limitations issues and then Rule 9(b).

## ARGUMENT

## I.    DEFENDANTS' PARTIAL SUMMARY JUDGMENT MOTION FOR CLAIMS FROM 1998 FORWARD SHOULD BE GRANTED

Branigan mischaracterizes this prong of defendants' motion as one addressed to the pleadings, Opp'n at p.16, but defendants' notice of motion expressly stated that they seek "summary judgment against the Amended Complaint insofar as plaintiff claims that defendants violated the FCA in connection with bills submitted to Medicare in or after 1998 . . . . "

Branigan has failed to identify a single material fact in dispute concerning defendants' focused partial summary judgment motion.  In an appropriate case, "summary judgment can and often should be granted without discovery." *Banks v. Mannoia*, 890 F. Supp. 95, 98 (N.D.N.Y. 1995).  Local Rule 7.1(a)(3) warns that "[a]ny facts set forth in the Statement ... shall be deemed admitted unless specifically controverted."  Yet, Branigan responds to each paragraph of the defendants' uncontested fact statement with identical, blanket denials and with nonspecific

---

[1]  Branigan's introduction concludes with cites to decisions that allegedly punished "precisely this conduct," but which actually bear no resemblance whatsoever to the instant case where the government has declined to intervene.  Plaintiff's Mem. of Law in Opp'n ("Opp'n") at p.2-3.

assertions that he needs discovery. *See generally* Pl.'s Resp. to Defs' St. of Material Facts ("Pl. Resp."). Moreover, he has not provided a Rule 56(f) affidavit explaining why he is unable to oppose the motion without such discovery, despite all of his claimed knowledge as a former chief Certified Registered Nurse Anesthetist ("CRNA") and all of the billing records in his possession.[2] Thus, defendants' uncontested facts have been admitted.[3]

Branigan's legal arguments also miss the mark. He cites numerous inapposite authorities for the proposition that it is not necessary in an FCA claim to prove that the government suffered financial damage. Opp'n at pp.17-18 n.8. But Branigan's string cite and the cases therein are off the point: defendants' motion is not based on a "damages" requirement. Rather, the controlling case of *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001) establishes that the FCA reaches only "improper claim[s] aimed at extracting money the government otherwise would not have paid" and "reaches only those claims with the potential wrongfully to cause the government to disburse money." *Id.* at 696. Here, it is undisputed that even if the Hospital was ineligible to submit bills using the QK or AA modifiers for medical direction or for personal performance by anesthesiologists, regulations from 1998 and after authorized the Hospital -- whose Bassett Physician Group encompassing both the anesthesiologists and the CRNAs is the billing provider -- to obtain the identical payment by using the QZ modifier to bill for its CRNAs acting without

---

[2] Complying with Rule 56(f) would have forced him to explain "(1) what facts are sought and how they are to be obtained, (2) how these facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Hudson River Sloop Clearwater, Inc. v. Department of the Navy*, 891 F.2d 414, 422 (2d Cir. 1989). Branigan's counsel's unsworn statement in a footnote that he would like to depose defendants' declarants and review unspecified records of The Mary Imogene Bassett Hospital (the "Hospital") does not suffice. Pl. Resp. at p.2 n.1. "A 'bare assertion' that the evidence supporting a plaintiff's allegations is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." *Contemporary Mission, Inc. v. United States Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981).

[3] *See, e.g., Banks*, 809 F. Supp. at 97 ("Since plaintiff has not submitted any affidavits for additional discovery and has, in fact, produced only conclusory allegations as to his need for further discovery, his objection may not serve to defeat summary judgment."); *Adams v. New York State Thruway Auth.*, No. 97-CV-1909, 2001 WL 874785, *1 n.1 (N.D.N.Y. March 22, 2001) (Mordue, J.) (Rule 7.1(a)(3) statement deemed admitted where it was "not properly admitted or denied").

medical direction.  Accordingly, there is no FCA violation because "the alleged noncompliance would not have influenced the government's decision to pay."  *Id.* at 697.

Branigan has no response to the authoritative statement of the Hospital's Part B carrier--an agent of Medicare--that, in cases of failed medical direction, the CRNA's services should be billed as personally performed under the QZ modifier.  Defendants' Memorandum ("D. Br.") at pp.9, 21.  Branigan repeatedly references a pleading filed by his counsel in a case in Minnesota.  In that case, Branigan's counsel expressly alleged that the QZ modifier should be used in this situation.  *See* Crowley Dec., Ex. A at p.43 ("Clearly this [procedure allegedly incorrectly billed by the anesthesiologist as personally performed] was a non-medically directed CRNA case, and as such should have been billed using the QZ modifier").  Branigan cannot and does not dispute that regulations in place since 1998 required the government to make the same payment decision in the same amount and to the same payee if the Hospital used the QZ modifier.

Further, Branigan's attempt to make use of an appellate decision and an *amicus* brief in the Minnesota case is disingenuous.  The decision in *Minnesota Association of Nurse Anesthetists v. Allina Health Systems Corp.*, 276 F.3d 1032, 1037, 1051-52 (8th Cir. 2002) and the quoted *amicus* brief explicitly addressed Medicare claims and regulations dated before 1998, when regulations reimbursed anesthesiologists at a higher rate than CRNAs.  Indeed, the quoted passage from an *amicus* brief in that case specifically references the very Government Accounting Office report that stimulated a <u>change</u> in the law and prompted Congress to require regulators to equalize payments for anesthesiologists and CRNAs.[4]  It is the new law and its implementing regulations upon which defendants rely.

Finally, Branigan also uses the *amicus* brief to make the point that there is a detriment to the government when it pays a bill from an ineligible provider, even if some other eligible provider could render the same bill for the services.  *See* Opp'n at pp.16-19.  This "diversion of

---

[4] *See generally* H.R. Conf. Rep. No. 103-213 at 764-65 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1453-54.

payments" theory is inapplicable, where, as here, the "provider" is not an individual anesthesiologist or CRNA; rather, the provider is the Hospital's Bassett Physician Group. Diversion of payments is, by definition, impossible when the recipient remains the same in either case. Not surprisingly, the government has not exercised its statutory right to intervene here and has not sought to file an *amicus* brief.

Without a factual or legal ground for opposing this prong of defendants' motion, Branigan falls back on *ad hominem* attacks about hospital policy and supposed attempts to avoid malpractice liability. The FCA does not exist to enforce internal hospital policy or state medical practice laws.

## II.    THE STATUTE OF LIMITATIONS BARS PLAINTIFF'S CLAIMS IN PART

The FCA's six year limitations period applies unless tolled, and the tolling provision only reaches an "official of the United States." 31 U.S.C. § 3731(b)(2). Citing this "clear statutory language," District Courts within this Circuit have twice refused to extend the tolling benefits of Section 3731(b)(2) to *qui tam* plaintiffs. *United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 6 F. Supp. 2d 263, 265 (S.D.N.Y. 1998); *see also United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-CV-2063, 2000 WL 1336487, at *11 (D. Conn. 2000). Branigan cites a handful of cases from other circuits that permitted tolling for *qui tam* plaintiffs, but, as the *Thistlethwaite* court noted, these isolated authorities must be rejected because they do not "adhere[] to the language of the statute." 6 F. Supp.2d at 265 n.1.

Even if the FCA tolling provision applies to relators, Branigan's claims must still be dismissed because "when the statute which creates the cause of action contains a statute of limitations, the plaintiff must plead facts which show that the claim is not time barred under that

statute."[5]  Branigan points only to a dubious "reasonable inference" for the Court to divine from his amended complaint, not facts alleged therein.[6]

Claims from before May 2, 1997 are also barred because Branigan's initial complaint was not a proper pleading under Rule 9(b) that was capable of interposing claims when it was filed on or about February 19, 2002.  Branigan advocates that this Court ignore Rule 9(b) because the initial complaint was filed under seal.  *See* Opp'n at p.23.  But he cites no authority to support this novel reading of Rule 9(b).

In any event, the initial pleading did not validly interpose claims that the Hospital falsely billed for personal performance and medical supervision by anesthesiologists.  "[A]n amendment will not relate back if it sets forth a new set of operational facts."  *Holdridge v. Heyer-Schulte Corp.*, 440 F. Supp. 1088, 1093 (N.D.N.Y. 1977); *accord, Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983) (cited by Branigan; allowing relation back "where an amendment does not 'allege a new cause of action but merely … make[s] defective allegations more definite and precise'").  Here, the amended complaint attacks whole new classes of Medicare bills on the basis of an entirely new set of allegations concerning defendants' supposed noncompliance with personal performance and medical supervision regulations that the initial pleading never even mentioned.

Finally, the six year limitations period bars the third cause of action (conspiracy under Section 3729(a)(3)) in its entirety.  The conspiracy was allegedly formed more than ten years ago.  "Under § 3729(3), the act which begins the running of the limitations period is the

---

[5] *Alfaro v. E.F. Hutton & Co. Inc.*, 606 F. Supp. 1100, 1111-12 (E.D. Pa. 1985); *accord, Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166, 1180-81 (S.D.N.Y. 1990).

[6] Branigan's "reasonable inference" that he "didn't discover the fraud until he was appointed Chief CRNA" (Opp'n at p.22) is belied by contradictory statements that he "personally observed the fraud being committed on numerous occasions over a ten-year period … has personal knowledge that bills were, in fact, submitted by the hospital for the services in question" and that "the defendants failed to satisfy the [Medicare] requirements … in every time-billed case which they billed during this time period."  Opp'n at pp.12-13; *see also* Amended Complaint ¶¶ 23,25.  Thus, Branigan admits that "facts material to the right of action [were] known or reasonably should have been known" to him ten years ago.  31 U.S.C. §3731(b)(2).

formation of the conspiracy." *Blusal Meats, Inc. v. U.S.*, 638 F. Supp. 824, 829 (S.D.N.Y. 1986), *aff'd*, 817 F.2d 1007 (2d Cir. 1987) (which Branigan does not even cite).

## III.    BRANIGAN FAILS TO COMPLY WITH RULE 9(b)

The fundamental problem with the amended complaint is Branigan's inability or unwillingness to provide specifics with respect to (i) identified individual defendants, and (ii) the respects in which the services cited in paragraph 38 of the amended complaint did not satisfy Medicare requirements.

Branigan essentially concedes that his allegations of a supposed fraudulent scheme that appear in paragraphs 21 through 37 of the amended complaint lack in any specifics.  He instead asserts that his pleading is saved by identifying an apparently random sample of the Hospital's Medicare bills in paragraph 38 and asserting, without any explanation, that every one was "falsely billed."  This is supposedly enough "because of the all-encompassing allegations, *i.e.*, that the defendants failed to satisfy medical direction requirements or personal performance requirements in <u>every</u> time-billed case which they billed during this time period because they were never in the operating room and never performed either <u>induction</u> or <u>emergence</u>."  Opp'n at p.13 (emphasis in original).  Branigan posits a who?/what? approach, Opp'n at p.4, but answers those questions by saying in substance that the "who" is everyone and the "what" is everything.  He thus seeks to satisfy the particularity requirement with universal allegations, but that is exactly what the rule prohibits.  *Compare United States ex rel. DeCarlo v. Kiewit/AFC Enter., Inc.*, 937 F. Supp. 1039,1050 n.9 (S.D.N.Y. 1996) (dismissing under Rule 9(b) where relator alleged that every one of defendants' reports were false).

Branigan's assertion that a Minnesota federal district court upheld a pleading with "nearly identical allegations" is demonstrably false.  Opp'n at p.12.  Following dismissal of a previous pleading on Rule 9(b) grounds, that court approved a Third Amended Complaint that contains the very sort of detail that is lacking here.  *See* Iannicelli Decl., Ex. J (opinion); Crowley

6

Decl., Ex. A (Third Amended Complaint).  Instead of identifying bills from particular days and

concluding without explanation that they were "falsely billed" as Branigan has done, the Third

Amended Complaint in the Minnesota case identifies the defendant physicians by name and

explains why each of the selected bills is allegedly false.[7]  A similar level of detail is required

here, especially because Branigan claims to be a witness to thousands of procedures and a

recipient of thousands of billing records.

The Minnesota court's criticism of an earlier pleading from Branigan's counsel echoes

defendants' objections to the amended complaint herein:

> Plaintiffs' complaint sketches the general fraudulent scheme that Defendants
> allegedly perpetrated.  In describing the fraudulent activity, the complaint
> generically references the Defendants as the "defendant anesthesiologists,"
> "defendant hospitals" or even as "various defendant hospitals." . . . Plaintiffs
> must provide some representative examples of the fraud which detail the specifics
> of who, where and when. . . . Plaintiffs' complaint must be dismissed for failure
> to comply with Rule 9(b).

United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Healthcare Sys. Corp., Civ.

No. 4-96-734, 1997 U.S. Dist. LEXIS 21402, at *33-34 (D. Minn. March 3, 1997) (dismissing

under Rule 9(b)).  Branigan's amended complaint herein generically references the Defendants

as 'defendant anesthesiologists,' naming an anesthesiologist only once.  The amended complaint

does not include any allegations specific as to the nature of the involvement, if any, of the

defendant anesthesiologists in the Hospital's submission of Medicare bills.  The conspiracy

claim completely lacks any specifics concerning the formation of the alleged "conspiracy."

Faced with this large gap in his pleading -- no nexus is alleged between an identified

individual defendant and an identified fraudulent act -- Branigan offers up the excuse that he is

concerned about "confidentiality" of defendants' names.  Opp'n at p.13.  While concern about

---

[7] See, e.g. Crowley Decl., Ex. A at p.29 (alleging that medical direction bill was false because the anesthesiologist was supposedly present for only 20 minutes of an hour and thirty minute procedure); id. at p. 36 (alleging that personal performance bill was false because there was an overlapping procedure, "and billing one of them as personally performed is clear fraud"); id. at p.47 (alleging that an anesthesiologist had made a false claim by billing "for personally performing a procedure from 9:40 to 14:30 while concurrently involved in a procedure in another case from 7:15 to 10:05").

patient names is laudable, the defendants' names are in the caption.  In the Minnesota case, the

Third Amended Complaint tied <u>named</u> individual defendants to specific services.  Branigan does

not know which anesthesiologists performed the services referred to in paragraph 38.  It is no

answer that the Hospital can tie it back by provider number, because Rule 9(b) is in part a test of

the plaintiff's knowledge, a test which Branigan has failed.  For example, in *United States v.*

*Centracare Health System, Inc.*, 2002 WL 1285089 at * 3 (D. Minn. 2002) (cited by Branigan)

(dismissing FCA complaint on Rule 9(b) grounds because of failure to tie the individuals by

name to alleged frauds), the court noted that the

> complaint's generalized references to "agents of St. Cloud's Hospital" is as
> deficient as was plaintiff's reference to . . . "defendant anesthesiologists" in
> MANA.  Remarkably, the government [which had intervened] suggests that this
> type of pleading is sufficient because defendant St. Cloud's Hospital was [the
> relator's] employer and therefore knows with whom she had daily contact.
> However, the burden rests with the government, not the defendants, to plead their
> fraud allegations.

> Let Branigan and his counsel, subject to Rule 11, allege which anesthesiologists

committed fraud in particular cases, and how they did so.  Holding him to this standard of

particularity is consistent with the purpose of Rule 9(b), which is to "discourage meritless fraud

accusations," *United States ex rel. Ortega v. Columbia Healthcare, Inc.,* 240 F.Supp. 2d 8, 18

n.12 (D.D.C. 2003), and "to eliminate fraud claims in which all the facts are learned through

discovery after the complaint is filed."  *United States ex rel. Vallejo v. Investronica, Inc.,*  2 F.

Supp.2d 330, 338 (W.D.N.Y. 1998).

Although Branigan also requests this Court to find that "less specificity is required" here

because "the information is [allegedly] more likely in the defendants' possession than the

plaintiff's," Opp'n at p.11, he does not address defendants' authorities establishing that is it

inappropriate to relax Rule 9(b) for plaintiffs, like Branigan, who should be held to a *higher*

standard because of their superior access to information.  *See* D. Br. §II.C.  Nor does he have a

response to decisions rejecting relaxed pleading standards in Medicare fraud cases. *See id.*

Defendants never contended that Branigan must identify every alleged false claim in his pleading but he attacks this phantom argument at great length. *See* Opp'n at pp.10-11, 13-14. Branigan also argues that he could satisfy the specificity requirement "even if no representative examples [of supposed false claims] were given," [8] but his own words elsewhere directly contradict him. *See* Opp'n at p.10 ("a Relator must 'provide some representative samples of fraud which details specifics of who, where and when'") (citing authorities).

## IV.   THE MEDICAL SUPERVISION CLAIMS FAIL TO STATE A CLAIM

The interpretation of a regulation is a question of law for the Court and not, as Branigan would have it, an issue of fact for the jury. *See* Opp'n at p.25. The plain language of 42 C.F.R. § 414.46(e) contradicts Branigan's claim that, in "medical supervision situations, the anesthesiologist is still required to perform the seven steps ... including, but not limited to 'induction' and 'emergence,'" Amended Complaint ¶32. Alternatively, Branigan cites a repealed regulation for the proposition that the medical supervision regulation used to require more. *Id.* (citing 42 C.F.R. § 405.552(b); repealed as of 1999). Former 42 C.F.R. § 405.552(b), however, governed a separate category of Medicare bills that Branigan does not challenge. [9] Even this unrelated former regulation, however, would contradict his claim that involvement with

---

[8] Branigan cites several cases from outside the Second Circuit for the theory that Rule 9(b) is nothing more than a notice-pleading rule. Opp'n at p.14. This view has not been followed in the Second Circuit, which applies Rule 9(b) strictly because its purposes include, in addition to notice, "protecting a defendant from harm to his reputation or goodwill [and] reducing the number of strike suits." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1248 (2d Cir. 1987); *accord, Acito v. IMERCA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995).

[9] His medical supervision claims address "specific false claims submitted by the defendants [that] can be found in electronic and written bills known as HCFA 1500 forms that were submitted ... to their Medicare carrier." Amended Complaint ¶33. HCFA 1500 forms and carriers are used in Medicare's Part B program, which reimburses physicians or their assignees for services to particular patients. *See generally* 1 CCH Medicare & Medicaid Guide ("MMG") ¶¶ 3110, 3185 (2003). Hospitals and similar institutions bill their facility-based health care services to "intermediaries" under the Part A program. *See* 1 MMG ¶ 3110. Physician services that primarily benefit the facility, rather than particular patients, also fall under Part A. *See* 1 MMG ¶ 3451. Until it was repealed in 1999, former 42 C.F.R. § 405.552(b) expressly authorized just this sort of Part A service. *See* 42 C.F.R. § 405.552; ("In these cases, the intermediary pays for the services ... on reasonable cost payment for physician services to [Part A] providers...."); *see also* 48 Fed. Reg. 8927 (March 2, 1983) (promulgating 405.552(b); noting that "[t]he provider [facility in which the services were rendered] will be paid for the allowable costs of those services on a reasonable cost basis by the intermediary"). Since 1992, 42 C.F.R. § 414.46(e) has governed the Part B billing for medical supervision by anesthesiologists that Branigan challenges. See Medicare Provider Reimbursement Manual § 2182.8G; Medicare Carriers Manual § 8313I.



induction and emergence is necessary. *See* Iannicelli Dec., Ex. M ("the physician is not required to meet the criteria of paragraphs (a)(1)(iii) [induction and emergence] and (vii) [post-anesthesia care]" of the medical direction regulation).

**CONCLUSION**

For the foregoing reasons and for the reason stated in the defendants' opening memorandum, defendants' motion should be granted.

Dated: New York, New York
       September 30, 2003

                PILLSBURY WINTHROP LLP

                By: _____
                    Leo T. Crowley (NDNY bar number 103706)

                One Battery Park Plaza
                New York, New York 10004-1490
                Tel:  (212) 858-1000
                Fax:  (212) 858-1500

                Attorneys for Defendants

Of counsel:
       Maria T. Galeno
       Daniel Z. Mollin
       Eric T. Streck

# APPENDIX

*Adams v. New York State Thruway Auth.*, No. 97-CV-1909, 2001 WL 874785
(N.D.N.Y. March 22, 2001) ......................................................................................Tab A

H.R. Conf. Rep. No. 103-213 at 764-65 (1993), *reprinted in* 1993 U.S.C.C.A.N.
1453-54. .........................................................................................................................Tab B

*United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Healthcare
Sys. Corp.*, Civ. No. 4-96-734, 1997 U.S. Dist. LEXIS 21402 (D. Minn. March 3, 1997)...Tab C

1 CCH Medicare & Medicaid Guide ¶¶ 3110, 3185, 3451 (2003) ........................................Tab D

48 Fed. Reg. 8927 (March 2, 1983) ...................................................................................Tab E

Medicare Provider Reimbursement Manual § 2182.8 ...........................................................Tab F

Medicare Carriers Manual §8313 ......................................................................................Tab G

# EXHIBIT A

United States District Court, N.D. New York.

Willard ADAMS, Plaintiff,
v.
NEW YORK STATE THRUWAY AUTHORITY,
Defendant

No. 97-CV-1909.

March 22, 2001.

Legal Services of Central New York, Inc., Attorneys for Plaintiff, Syracuse, Susan M. Young, Esq.

Eliot Spitzer, Attorney General of the State of New York, Attorneys for Defendant, Office of the Attorney General, The Capitol, Albany, Deborah A. Ferro, Esq., Of Counsel.

## MEMORANDUM DECISION AND ORDER

MORDUE, D.J.

### I. INTRODUCTION

*1 Plaintiff, Willard Adams ("plaintiff") was employed as a Bridge Maintenance Supervisor I ("BMS I") by defendant, New York State Thruway Authority ("defendant" or "the Thruway") for 26 years. Plaintiff was terminated on March 14, 1997, after being absent more than one year by reason of disability. Plaintiff claims he was discriminated against by defendant because of his alleged disability in violation of the Rehabilitation Act of 1973, and § 296 of the New York State Human Rights Law ("NYHRL"). Specifically, plaintiff's complaint alleges claims of hostile work environment, failure to promote, denial of a reasonable accommodation, and retaliation. The Thruway moves for summary judgment on all claims.

### II. FACTUAL BACKGROUND [FN1]

FN1. Defendant properly filed a Statement of Material Facts pursuant to Local Rule 7.1. Plaintiff responded to defendant's Local Rule 7.1 Statement of Material Facts, but did so incorrectly, without, in most cases, admitting or denying each factual statement made by defendant as required by Local Rule 7.1. Although the Court will not strike Plaintiff's Response to Defendant's Statement of Material Facts as defendant requests, to the extent plaintiff's responses violate Local Rule 7.1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff. Local Rule 7.1(a)(3) states:
The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non- movant contends are in dispute. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*
Local Rule 7.1(a)(3)(emphasis in original).

Plaintiff began working for the Thruway in 1971 as a laborer. Subsequently, the Thruway assigned plaintiff to work on bridges, and in 1986, promoted him to the position of Bridge Maintenance Supervisor I ("BMS I"). Plaintiff's position required him to supervise a work crew, and repair and maintain bridges in the Syracuse Division of the Thruway. The Thruway gave plaintiff satisfactory performance evaluations throughout his career. Plaintiff held his position as a BMS I until he was terminated on March 14, 1997. The Thruway terminated plaintiff because he had been absent more than a year by reason of disability. Plaintiff contends that his disability surfaced because of harassment by co- workers at the Thruway. Plaintiff avers this alleged harassment lead to stress, anxiety, and depression, which eventually caused plaintiff to suffer "atypical depressive disorder," required him to take sick leave, and rendered him unable, even at the end of his leave, to return to work as a BMS I in the Syracuse Division, for fear his symptoms would resurface.

Plaintiff states that he encountered difficulty with co-workers and supervisors at various times during his employment with the Thruway. In the early 1980's, plaintiff observed a group of Thruway workers commuting to work in a Thruway vehicle from Weedsport, New York to the Syracuse Bridge Shop. Plaintiff complained to supervisors that this was an illegal use of a Thruway vehicle. As a result, those workers were no longer permitted to utilize a Thruway vehicle to commute to work.

Plaintiff claims that from that point on, those workers, including Rick Warrick ("Warrick"), Albert Rilk ("Rilk"), and Fred Schwarting ("Schwarting"), held a grudge against him. Plaintiff admitted in his deposition that he did not like Warrick's attitude, had personality differences with Rilk and Schwarting, and believed Schwarting was a racist. Plaintiff contends that Warrick, Rilk, Schwarting, and others continually harassed him. Plaintiff alleges that in May 1987, his co-workers hung a card board sign in the Syracuse Bridge Shop with his name, and the name of another co-worker, on it, their civil service exam scores, a picture of a gun, and the words "bang, bang." Plaintiff states that in August 1989, he entered the Syracuse Bridge Shop to find a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
20 NDLR P 125
(Cite as: 2001 WL 874785 (N.D.N.Y.))

parachute with a roll of toilet paper hanging from the ceiling. Plaintiff claims that co-workers commented on the display saying, "the only thing that falls out of the sky is bird shit and fools," and "no normal person jumps out of a perfectly good airplane." Plaintiff said he felt this display was a derogatory reference to his status as a veteran and former Army paratrooper. Plaintiff testified that throughout September 1990, his co-workers referred to him as "squirrels" and "nuts" after learning that plaintiff had been to see a clinical psychologist. Plaintiff alleges that in October 1991, "Kill Will Adams" was written on a bulletin board in the Syracuse Bridge Shop. Additionally, plaintiff asserts that he found a cartoon featuring a coffin on a bulletin board that made reference to "being carried out," though plaintiff admits that cartoons in the Syracuse Bridge shop were common; that co-workers took his time cards; and that co-workers hung beer cans on a post in plaintiff's section of the Thruway to make him look bad.

*2 Plaintiff avers that he made oral and/or written complaints to supervisors after each occurrence, but was unhappy when nothing was done in response. For example, in regard to the comments about "squirrels and nuts," plaintiff contends his supervisor told him that although the comments could be construed as harassment, they may also be in reference to co-workers' hunting hobby.

Plaintiff first sought the help of Dr. Stefan Massong, a clinical psychologist, in 1988 because he was experiencing symptoms of depression. Plaintiff states that he initially attributed his anxiety, stress and depression to concerns he was having about his young son. Dr. Massong, however, told plaintiff that he believed the larger issues surrounding plaintiff's symptoms had more to do with caring for his aged and invalid mother, who lived with plaintiff and his family, and stresses at his work site. Dr. Massong stated in his deposition that at their first meeting plaintiff was in crisis, depressed, anxious, and distressed. Dr. Massong met with plaintiff over a four month period and diagnosed plaintiff with "adjustment disorder." [FN2] Plaintiff took six weeks off work in 1988 to cope with his difficulties.

> FN2. "Adjustment Disorder" was described by Dr. Massong in his deposition to be a diagnostic category that represents in general relatively mild symptomatic disturbances, anxiety, depression, behavioral disturbances an individual may have for a circumscribed period of time, four months, for example, during which time, the symptoms resolve themselves.

Plaintiff did not seek the help of his psychologist again until the summer of 1990 after the Thruway required him to undergo a psychiatric evaluation, upon learning that plaintiff brought a loaded gun to a restaurant where a union meeting

was being held. According to the Thruway, Jim Hennessey ("Hennessey"), a BMS I in the Syracuse Division, and co-worker with whom plaintiff had an adversarial relationship, saw plaintiff talking with co-workers in the restaurant and overheard plaintiff mention that he was carrying a loaded weapon, and make a comment about shooting someone. Plaintiff admits bringing a gun to the restaurant, and discussing the loaded weapon with co-workers, but asserts in his defense that he has a permit for the weapon, that he never displayed the weapon, and that he only jokingly made comments about shooting someone.

Hennessey reported his observations of plaintiff to Jon Meldrim ("Meldrim"), the Syracuse Division Director of the Thruway. Meldrim stated in his deposition that although, personally, he believed plaintiff was not serious about shooting someone, he did not feel professionally qualified to make that determination, so he requested that plaintiff undergo a psychiatric evaluation for the safety and well being of all concerned.

On June 26, 1990, plaintiff was sent to Albany to submit to an examination by psychiatrist, Dr. Melvin Steinhardt. Dr. Steinhardt found that even though plaintiff had some evidence of offensive personality traits, in terms of his frankness and rather brash approach, plaintiff was not a threat, and was fully capable of carrying out the duties of his position.

Distraught and embarrassed after being sent by his employer to undergo a psychiatric evaluation, plaintiff went to Dr. Massong for help. Plaintiff told Dr. Massong that he was upset because he felt his supervisors and co-workers believed that he had mental problems and was not capable of performing his job. Plaintiff met with Dr. Massong for several months, but took no time off work. Following treatment, Dr. Massong stated that plaintiff was able to continue to work, perform his usual duties, and keep his symptoms to a minimal status.

*3 From 1990 to 1995, plaintiff continued to work for the Thruway as a BMS I. During that time, plaintiff did not require the help of Dr. Massong, but claims he continued to suffer teasing by his co-workers as described above, and that he was treated less favorably than the other BMS I, Hennessey. Plaintiff, in his memorandum of law, asserts that the different treatment "extended to job assignments, crew assignments, and the procedure used when their mutual supervisor was not at work." After parsing the record, the Court finds that plaintiff was alluding to the fall of 1992, when plaintiff's projects were switched with Hennessey's projects, and plaintiff was made to work in Hennessey's section of the Thruway in the Syracuse Division. The record also shows that plaintiff complained to supervisors that he and Hennessey had unequal crews, more

Not Reported in F.Supp.2d
20 NDLR P 125
(Cite as: 2001 WL 874785 (N.D.N.Y.))

specifically, plaintiff's crew contained trainees while Hennessey's did not. In regard to the "procedure used when their mutual supervisor was not at work," plaintiff appears to be referring to a time 1991 when the Thruway allegedly changed the policy of asking plaintiff to take on additional supervisory duties on days when the Bridge Maintenance Supervisor II ("BMS II") was absent, to requiring plaintiff to alternate with Hennessey on such days. The additional duties included answering phones and tending to the Syracuse Bridge Shop office. Upset by these changes, plaintiff contacted the Thruway with his complaints. As a result, plaintiff met with John Meldrim and a mediator in attempt to resolve plaintiff's issues. They met once on February 17, 1993, but pursuant to Meldrim's request, did not meet again, and the conditions, according to plaintiff, did not change.

In July 1995, plaintiff learned that the Syracuse Division BMS II sustained a heart attack, and that the Thruway needed an individual to temporarily step into his position. It appears from the record that plaintiff and Hennessey were the two individuals under consideration.

Shortly after the Thruway announced the temporary position, plaintiff met with Jon Dussing ("Dussing"), the Syracuse Division Bridge Engineer, and the individual responsible for supervising BMS IIs, to discuss the position. Plaintiff asserts that he viewed Dussing as an untrustworthy person who would not take responsibility for his actions. During the meeting, Dussing, concerned about plaintiff's ability to cooperate, asked plaintiff how he would show a willingness to cooperate with his superiors. The Thruway states that plaintiff did not reply. Plaintiff, however, said that he replied that the Thruway would have trouble with Warrick (one of plaintiff's alleged harassers) if Hennessey were promoted to BMS II.

The Thruway avers that based on plaintiff's above response, and his inability to cooperate with his superiors, the Thruway offered the temporary promotion to Hennessey, who at that point, was ranked number one on the state-wide civil service list of individuals qualified for a BMS II position. As a BMS II in the Syracuse Division, Hennessey, would be plaintiff's superior. Plaintiff testified that on July 26, 1995, after learning the Thruway gave Hennessey the temporary promotion, he parked his Thruway vehicle, with the keys inside, in front of the gate to the Syracuse Bridge Shop, and left the site. This was the last day plaintiff was on the job with the Thruway.

*4 Plaintiff states that shortly after losing the promotion, he went to see his physician, Dr. John Merola, who diagnosed plaintiff with tachycardia, or chest pain, and reactional or situation hypertension. According to plaintiff, Dr. Merola prescribed Zoloft, an antidepressant, and contacted Dr.

Massong because he was concerned about plaintiff's mental state.

Dr. Massong met with plaintiff on August 1, 1995. Dr. Massong testified that at their initial meeting, plaintiff looked like he had not slept for days, appeared devastated, and was psychologically and emotionally a mess. Dr. Massong states that plaintiff told him that he was upset by the harassment he was experiencing at work, and expressed that he was very disappointed when he did not get the temporary BMS II position. According to Dr. Massong, plaintiff was feeling angry, sad, confused, rejected and betrayed by the events at the Thruway, and believed that there was a long standing animosity and bias toward him by his superiors and those around him. Plaintiff told Dr. Massong that he had been mis-characterized by others at work as one who was violent, mentally unstable, and a poor leader. Dr. Massong diagnosed plaintiff with "atypical depressive disorder," and advised him to take sick leave. Plaintiff followed Dr. Massong's advice and continued to meet regularly with Dr. Massong for the next eight or nine months.

The Thruway disputes plaintiff's assertion that he suffers "atypical depressive disorder." The Thruway contends, based on an examination performed in July 1998 by Dr. Robert Seidenberg, a psychiatrist, in connection with plaintiff's Worker's Compensation claim, that any problems plaintiff has are a result of life-long, pre-existing, "personality problems," not because of an impairment or dysfunction.

Plaintiff states that he took the civil service exam in October 1995, though still undergoing treatment with Dr. Massong, and on sick leave, so that he would be placed on the state-wide list of individuals qualified to be a BMS II, should a position become available. Plaintiff placed third on the list, while Hennessey placed seventh. According to the Thruway, there was, however, in existence, an older civil service list that would be viable until January 7, 1996, on which Hennessey was ranked number one.

On December 28, 1995, while plaintiff was on sick leave and undergoing treatment with Dr. Massong, the Thruway made Hennessey's temporary BMS II position permanent upon learning that the BMS II Hennessey was filling in for would be unable to return to his position due to illness. The Thruway contends that it relied on the "older" civil service list ranking Hennessey first in making Hennessey the permanent BMS II in the Syracuse Division.

In January 1996, less than a month after Hennessey became BMS II, the Thruway offered plaintiff two BMS II positions, a permanent position at the Nyack Bridge, and a seasonal position at the Tappen Zee Bridge. [FN3] Plaintiff declined the positions because of his ongoing treatment with

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Dr. Massong.

> FN3. In 1995, plaintiff placed his name on a Thruway transfer list.

**\*5** After approximately eight months of treatment, Dr. Massong wrote the Thruway indicating plaintiff would be released to return to work at the Thruway on April 16, 1996. Dr. Massong stated that he felt plaintiff was fully able to perform his duties, so long as he did not work in the Syracuse Division, as his symptoms would return.

Anticipating a return to work, plaintiff filed a reasonable accommodation request with the Thruway Office of Equal Opportunity and Compliance on February 6, 1996. Plaintiff requested, "A work environment, or location free of discriminatory behavior and harassment I have experienced at my present work location. Preferably a work location with little, or no contact with the present [Syracuse] Division Bridge Management, as they are the cause of my current medical conditions." Ex. L, 12. Plaintiff admits he told the Thruway he had no interest in a desk position. Plaintiff received a letter dated March 16, 1996, indicating that the Thruway could not offer him a reasonable accommodation at that time, but advising plaintiff to place his name on a transfer list for positions in other Divisions.

On March 31, 1996, plaintiff filled out a transfer request indicating an interest in permanent or temporary positions in the following Thruway Divisions: New York, Albany, Syracuse, and Buffalo. The Thruway has an agreement with the employees union which provides that the right to transfer is based on seniority.

In addition to offering plaintiff the two promotions described above, the Thruway offered plaintiff five more positions based on the information in his transfer requests, all of which he declined. In March 1996, the Thruway offered plaintiff a position as a seasonal BMS I at the Niagara Bridge. In April 1996, the Thruway offered plaintiff a position as a seasonal BMS I at the Newburgh Bridge. In May 1996, the Thruway offered plaintiff two seasonal BMS I positions, one at the New England Bridge and on at the Nyack Bridge. Plaintiff declined each offer, this time asserting that the cost of living was too high for a temporary move, he did not want to commute to his appointments with Dr. Massong or his Worker's Compensation appearances, and he did not want to leave his son who was still in high school. In November 1996, the Thruway offered plaintiff a permanent BMS I position at the New England Bridge. Plaintiff told Thruway he was interested in the position so long as he was allowed to transfer as soon as a position closer to home became available. The Thruway avers it could not honor plaintiff's request because of a Collective Bargaining Agreement with the employees union that prohibited transferees from placing their names on the

transfer list for one year after transfer to allow others the opportunity to transfer. Thus, plaintiff declined the position.

Additionally, plaintiff admits he was informed of three, permanent and/or seasonal, BMS I openings that became available between February and November 1996, at the Newburgh, Amsterdam, and Berkshire Bridges. However, plaintiff alleges that after he communicated his interest in the position to the Thruway, he was told that the positions were not going to be filled. The Thruway asserts that financial concerns and lack of work prevented it from filling these positions. Plaintiff, however, avers that these positions were left unfilled so the Thruway would not have to offer him any of the positions, and that after he was terminated, the positions were given to employees with less seniority. On December 16, 1996, the Thruway advised plaintiff that his termination was being recommended because he had been absent more than one year by reason of disability, and that he had a right to a pre-termination hearing.

**\*6** At plaintiff's request, the pre-termination hearing took place on February 25, 1997. The hearing officer determined that plaintiff was absent from work for one year by reason of disability. Consequently, the Thruway terminated plaintiff pursuant to § 73 of the Civil Service Law [FN4] termination effective March 14, 1997.

> FN4. § 73 of the Civil Service Law states:
> When an employee has been continuously absent from and unable to perform the duties of his position for one year or more by reason of a disability, other than a disability resulting from occupational injury or disease as defined in the workmen's compensation law, his employment status may be terminated and his position may be filled by a permanent appointment. Such employee may, within one year after the termination of such disability, make application to the civil service department or municipal commission having jurisdiction over the position last held by such employee for a medical examination to be conducted by a medical officer selected for that purpose by such department of commission. If, upon such medical examination, such medical officer shall certify that such person is physically and mentally fit to perform the duties of his former position, he shall be reinstated to his former position, if vacant, or to a vacancy in a similar position or a position a lower grade in the same occupational field in his former department or agency. If no appropriate vacancy shall exist to which such reinstatement may be made, or if the work load does not warrant the filling of such vacancy, the name of such person shall be placed on a preferred list for his former position in his

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

former department or agency, and he shall be eligible for reinstatement in his former department or agency from such preferred list for a period of four years. In the event that such person is reinstated to a position in a grade lower than that of his former position, his name shall be placed on the preferred eligible list for his former position or any similar position in his former department or agency. This section shall not be deemed to modify or supercede any other provisions of law applicable to the re-employment of persons retired from the public service on account of disability.

N.Y. CIV. SERV. LAW § 73 (McKinney 1999).

Plaintiff testified in his deposition that he has been employed at various times since being terminated by the Thruway. Plaintiff worked for MS Unlimited as a driver, but was terminated for unauthorized leave. Plaintiff also stated that he has been employed by Salinger Trucking, Abate Engineering in Buffalo, New York, and New York Central Coach.

As a result of the foregoing events, plaintiff filed a number of claims:

First, plaintiff filed a claim for Workers' Compensation, arguing his work rendered him totally disabled as of July 26, 1995. Plaintiff's claim is currently on appeal.

Second, on February 5, 1996, plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") claiming the Thruway discriminated against him because of his age, alleging that preferential treatment, work assignments, and a promotion were given to a younger employee. On July 31, 1996, the EEOC concluded its investigation finding no likely cause of action on an age discrimination claim, and issued a right to sue letter.

Third, on January 21, 1997, plaintiff filed a complaint with the State of New York Public Employment Relations Board, against his union and the Thruway alleging that the union failed to represent him in good faith in his relations with the Thruway. This complaint was found to be deficient, and dismissed.

Fourth, on March 14, 1997, plaintiff filed for disability retirement benefits claiming he was permanently incapacitated from performing his duties. The claim was disapproved.

Finally, on December 31, 1997, plaintiff filed the present action in U.S. District Court claiming the Thruway discriminated against him in violation of the Rehabilitation Act and New York State Human Rights Law. Defendant moves for summary judgment dismissing plaintiff's action.

## III. DISCUSSION

### A. Arguments of the Parties

Plaintiff argues that the Thruway discriminated against him on the basis of his alleged disability in violation of the Rehabilitation Act. Plaintiff asserts that he became disabled within the meaning of the Rehabilitation Act in July 1995 when the events at the Thruway triggered a mental impairment, "atypical depressive disorder," which substantially limits him in the major life activity of working. Plaintiff argues that the Thruway discriminated against him because he is disabled by denying him the permanent BMS II promotion in the Syracuse Division, and a reasonable accommodation. In the alternative, plaintiff contends that even if the Court finds he suffers no such impairment, he can be considered disabled for the purposes of the Rehabilitation Act because the Thruway regarded him as disabled. Plaintiff further argues that prior to July 1995, though he had not yet suffered "atypical depressive disorder," he can still be considered disabled because the Thruway regarded him as having a disability, and on that basis subjected him to a hostile work environment and denied him the temporary BMS II position.

*7 Plaintiff also alleges that the Thruway retaliated against him for engaging in activity protected by the Rehabilitation Act. Plaintiff avers that he was denied a promotion, reasonable accommodation, and terminated because he opposed the Thruway's "unlawful employment practices."

Finally, plaintiff asserts that in the event his federal claims under the Rehabilitation Act are dismissed, the Court should exercise supplemental jurisdiction over his state law claims, and find that the Thruway violated New York Human Rights Law by subjecting him to discrimination based on his disability.

The Thruway moves for summary judgment arguing it did not discriminate against plaintiff in violation of the Rehabilitation Act because plaintiff is not a person with a disability. The Thruway avers that plaintiff's alleged impairment is not an "atypical depressive disorder," but is nothing more than a rigid personality trait. Furthermore, the Thruway contends that even if plaintiff has an impairment, it does not substantially limit him in the major life activity of working because he is able to perform a broad range of jobs. In response to plaintiff's alternative argument, the Thruway claims that plaintiff was not at any time regarded as having a disability, and therefore plaintiff cannot succeed on his disability discrimination claims.

The Thruway also argues that plaintiff has failed to state a claim of retaliation under the Rehabilitation Act because he has only alleged he was retaliated against for opposing "unlawful employment practices," but has not shown he was

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

retaliated against for asserting rights under the Rehabilitation Act.

Finally, the Thruway submits that if the Court dismisses plaintiff's federal Rehabilitation Act claims, the Court should then refuse to exercise pendent jurisdiction and dismiss plaintiff's state law claims. If, however, the Court does not dismiss plaintiff's federal claims, defendant argues that plaintiff has no claim under New York State Human Rights Law.

B. *Standard for Summary Judgment*

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp v. Catrett,* 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed.R.Civ.P. 56(e).

**\*8** Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), the motion will not be defeated by a non-movant who raises merely "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *See Delaware & H.R. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Indeed, the nonmoving party's opposition may not rest on mere denials of the moving party's pleading, but "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a) which requires the court to grant judgment as a matter of law where there can be but one reasonable conclusion. *See Anderson,* 477 U.S. at 250. "It is a gratuitous cruelty to parties and their witnesses to put them through the ordeal of a trial when the outcome is foreordained." *Mason v. Continental Illinois National Bank,* 704 F.2d 361, 367 (7th Cir.1983). It is with these considerations in mind that the

Court addresses defendant's motion for summary judgment.

C. *Discrimination Claims under the Rehabilitation Act*

Section 504 of the Rehabilitation Act of 1973, prohibits discrimination by federally funded programs or activities against "otherwise qualified" individuals with a disability. Specifically, the Rehabilitation Act provides:
> No otherwise qualified individual with a disability in the United States as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a) (1999). Plaintiff claims the Thruway discriminated against him because of his alleged disability and violated the Rehabilitation Act by: (1) subjecting him to a hostile work environment; (2) denying him a promotion; and (3) refusing him a reasonable accommodation. The Rehabilitation Act applies the same standards as the Americans with Disabilities Act, and case law applicable to the ADA is applicable to the Rehabilitation Act. *See Francis v. City of Meriden,* 129 F.3d 281, 285 n.4 (2d Cir.1997).

To establish any one of plaintiff's claims under the Rehabilitation Act, plaintiff must establish that the claims at issue took place because of his disability. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75 (1998); *Gronne v. Apple Bank for Savings,* 98-cv-6091, 2000 U.S. Dist. LEXIS 3546, at \*20 (E.D.N.Y. Feb. 14, 2000)("Like other forms of discrimination, the discrimination forbidden ... against qualified individuals with disabilities, in order to be actionable, must take place because of a plaintiff's disability."). Thus, plaintiff must first prove a prima facie case of discrimination under the Rehabilitation Act. Plaintiff must show that: (1) he is an individual with a disability within the meaning of the Rehabilitation Act; (2) he was otherwise qualified to perform the job in question; (3) he was excluded from the job solely because of his disability; and (4) his employer receives federal funding. *See D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998); *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 721-22 (2d Cir.1994). "If proof of any of the four elements is lacking, the claim must fail." *Sedor v. Frank,* 42 F.3d 741, 746 (2d Cir.1994). The Court finds that each of plaintiff's claims under the Rehabilitation Act fail for the same reason: he is not a disabled person within the definition of the statute and therefore cannot prove a *prima facie* case of discrimination.

**\*9** The term disability is defined in the regulations that have been passed in accordance with the Rehabilitation Act and promulgated by the Department of Health and Human Services. *See* 45 C.F.R. § 84 *et seq.* These regulations are a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

companion to the statute and provide significant guidance in determining whether an individual is disabled, as they were "drafted with the oversight and approval of Congress." *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 279 (1987); *Alexander v. Choate,* 469 U.S. 287, 304 n.24 (1985)("We have previously recognized these regulations as an important source of guidance on the meaning of [the Rehabilitation Act]."). Under 45 C.F.R § 84.3(j)(1) a "handicapped person" [FN5] is defined as "any person who (i) has a physical or mental impairment which substantially limits one or more major life activity, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."

> FN5. In 1992, the definition of disability in the Rehabilitation Act was amended to substitute the term "disability" for "handicap." *See Francis v. City of Meriden,* 129 F.3d 281, 285 n.6 (2d Cir.1997)(citing Rehabilitation Act Amendments of 1992, Pub.L. No. 102-569, § 102(f)(1)(A), 106 Stat. 4344, 4384).

In his memorandum of law, [FN6] plaintiff argues that the Court can find him disabled because he suffered a mental impairment in July 1995 that substantially limits his ability to perform the major life activity of working. Alternatively, plaintiff argues that if the Court does not find that he is disabled under the first definition, he can still be considered disabled if the Thruway regarded him as suffering an impairment that substantially limits him in the major life activity of working. Plaintiff further argues that he can be considered disabled prior to suffering his impairment in July 1995, because the Thruway regarded him as disabled during that time. The Court will address each argument as presented.

> FN6. Plaintiff argues his claims somewhat differently in his complaint, asserting that "until approximately July, 1995, he was a person regarded as having an impairment, and since July 1995, he has been a person with a mental impairment which substantially limits him in the major life activity of working." Compl., 4. Because plaintiff encompasses and expands on these arguments in his memorandum of law, the Court will address them as they appear in his memorandum of law.

1. *Mental Impairment which Substantially Limits a Major Life Activity*

To determine whether plaintiff's alleged atypical depressive disorder constitutes a disability under 45 C.F.R. § 84.3(j)(1)(i) *supra,* the Court must engage in a two-prong inquiry. The first prong requires the Court to ascertain whether plaintiff suffers a mental impairment. Even if

plaintiff suffers a mental impairment, he cannot be considered disabled unless the second prong is satisfied, which requires that the mental impairment substantially limit one or more of plaintiff's major life activities. *See Heilweil,* 32 F.3d at 722.

The parties disagree as to whether plaintiff can satisfy the first prong. Plaintiff contends that he suffers a mental impairment in the form of an "atypical stress disorder," as diagnosed by his treating clinical psychologist, while defendant argues that plaintiff suffers no such disorder, and further, any anxiety or depression plaintiff experienced is a result of personality conflicts with supervisors and/or co-workers, and is no mental impairment.

According to 45 C.F.R. § 84.3(j)(2)(i)(B), a mental impairment under the Rehabilitation Act is "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." Personality conflicts or an inability to work under certain supervisors, however, do not rise to the level of a disability under the Rehabilitation Act. *See Schneiker v. Fortis Insurance Co.,* 200 F.3d 1055, 1062 (7th Cir.2000)(the court found the plaintiff was not disabled, even though she produced evidence sufficient to show she suffered major depression, because the record revealed that her inability to work was not caused by her depression, but by her inability to work under her supervisor.); *Siemon v. AT & T Corp.,* 117 F.3d 1173, 1176 (10th Cir.1997)(the plaintiff's "mental impairment merely prevent[ed] him from working under a few supervisors within the organizational structure of one major corporation," and he was therefore "not an 'individual with a disability.' "); *Potter v. Xerox Corp.,* 88 F.Supp.2d 109, 112 (W.D.N.Y.2000) (finding the plaintiff's inability to work under his supervisor was not an impairment that rose to the level of a disability even though he suffered from a depressive disorder that stemmed from his problems with management).

**\*10** Here, plaintiff acknowledges that personality conflicts alone do not establish a disability, but alleges that the personality conflicts with his co- workers and supervisors triggered his "atypical depressive disorder." In his memorandum of law, plaintiff relies on *Palmer v. Circuit Court of Cook County, Illinois,* 117 F.3d 351 (7th Cir.1997), which holds that a personality conflict is not disabling unless it "triggers a serious mental illness that is in turn disabling." *Palmer,* 117 F.3d at 351.

Even if the Court finds that plaintiff suffers from an "atypical depressive disorder" that was triggered by personality conflicts at the Thruway, he cannot satisfy the second prong of the definition of disability under the Rehabilitation Act, because plaintiff is not substantially limited in the major life activity of working. Plaintiff avers,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

and the Thruway disputes, that he is substantially limited in the major life activity in of working. The Supreme Court addressed this issue in, *Sutton v. United Airlines Inc.,* 527 U.S. 471, 491 (1999), and held that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Airlines Inc.,* 527 U.S. 471, 491 (1999). Furthermore, the Second Circuit has held that "a person found unsuitable for a particular position has not thereby demonstrated an impairment substantially limiting such person's major life activity of working." *Heilweil,* 32 F.3d at 723 ((citing *Daley v. Koch,* 892 F.2d 212, 215 (2d Cir.1989)); *see also Treglia v. Town of Manlius,* 68 F.Supp.2d 153, 158 (N.D.N.Y.1999)("To be substantially limited in the major life activity of working, one must be precluded from more than one type of job, or particular job of choice, if jobs utilizing plaintiff's skills are available, or if a host of different jobs are available, one is not precluded from a broad range of jobs."); *see also* 29 C.F.R. § 1630.2(j)(3). [FN7]

> FN7. The regulations in 29 C.F.R. § 1630.2(j)(3) were promulgated by the Equal Employment Opportunity Commission pursuant to the Americans With Disabilities Act. However, because the regulations promulgated pursuant to the Rehabilitation Act in 45 C.F.R. § 84.3 do not define "substantially limits", the regulations in 29 C.F.R. § 1630.2(j)(3) may be useful in the determination of whether an individual is substantially limited in the major life activity of working under the Rehabilitation Act. *See* 29 U.S.C. § 794(d)("the standards used to determine whether this section has been violated ... shall be the standards applied under title I of the Americans with Disabilities Act of 1990 ...."). 29 C.F.R. § 1630.2(j)(3) defines "substantially limits" as: "With respect to the major life activity of working-(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. 29 C.F.R. § 1630.2(j)(3).

Here, plaintiff fails to allege he is precluded from a broad range of jobs. Plaintiff simply asserts that he is unable to perform bridge maintenance in the Syracuse Division because the people employed there may prompt his symptoms to return. Plaintiff testified in his deposition that he can perform all the duties of a BMS I or II. His transfer

request demonstrates that he felt capable of working in almost any other bridge maintenance position with the Thruway. Plaintiff's own psychologist, Dr. Massong, wrote a letter to the Thruway in April 1996 telling the Thruway that plaintiff was fully able to perform his duties, and was ready to return to work, so long as he was not placed in the Syracuse Division. [FN8] Moreover, plaintiff has held four jobs since his employment with the Thruway. Even construing the facts in the light most favorable to plaintiff, the Court finds that plaintiff's allegation of an inability to work in one particular position falls short of the requirement under the Rehabilitation Act that he demonstrate an inability to perform in a broad range of jobs to be deemed "disabled."

> FN8. While plaintiff correctly states that 29 C.F.R. § 1630.2(j)(3) provides that a geographical area to which the individual has access is a factor for the Court to consider when determining whether a person is substantially limited in the major life activity of working, because plaintiff, himself, specifically requested a transfer to each of the locations throughout New York State where he was offered a position, the court finds that all locations to which plaintiff requested a transfer were in a feasible geographic location for the plaintiff. 29 C.F.R. § 1630.2(j)(3) lists the factors to be considered when determining whether an individual is substantially limited in the major life activity of working:
> (A) The geographical area to which the individual has reasonable access; (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).
> 29 C.F.R. § 1630.2(j)(3).

## 2. *Regarded as Having an Impairment*

**\*11** In the alternative, plaintiff argues he can still be considered disabled under the Rehabilitation Act if he proves the Thruway regarded him as having a mental impairment which substantially limits him in a major life activity. See 45 C.F.R. § 84.3(j)(iii).

To be sure, under the DHHS regulations, an individual may

Not Reported in F.Supp.2d
20 NDLR P 125
(Cite as: 2001 WL 874785 (N.D.N.Y.))

be found disabled under the "regarded as having an impairment" definition, if he:

(A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation; (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (C) has none of the impairments defined in paragraph (j)(2)(i) of this section but is treated by a recipient as having such an impairment. 45 C.F.R. § 84.3(j)(2)(iv); *see Francis v. City of Meridan,* 129 F.3d 281, 286 (1997)("To be considered disabled under the 'regarded as' prong ... a plaintiff must allege that the employer regarded the employee to be suffering from an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow disabled.").

Mere knowledge by an employer of an employee's impairment, however, is not enough to prove the employer regarded the employee as disabled. *See Reeves v. Johnson Controls World Services, Inc.,* 140 F.3d 144, 154 (2d Cir.1998). An employee must also show that the employer perceived such an impairment as substantially limiting the major life activity of working. *See Reeves,* 140 F.3d at 154 (holding that it was insufficient to show that the defendants were aware of the plaintiff's mental impairment to demonstrate that plaintiff was regarded as disabled, because the plaintiff must also show "that defendants perceived his impairment as substantially limiting the exercise of a major life activity."); *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir.1996) ("the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action.").

In this case, it is undisputed that the Thruway knew of plaintiff's difficulties. Plaintiff states that his co-workers were aware of his visits to Dr. Massong, as early as 1988. As stated above, however, mere knowledge by the employer of an employee's impairment is not enough to satisfy the "regarded as disabled" definition. *See Reeves,* 140 F.3d at 154. Plaintiff must also show that the Thruway regarded his impairment as substantially limiting him in a major life activity. *See Reeves,* 140 F.3d at 154. Thus, plaintiff's alternative argument fails for the same reason as his first one does under the Rehabilitation Act. Although the Thruway was aware of plaintiff's difficulties, there is no basis to conclude that the Thruway viewed plaintiff as substantially limited in the major life activity of working. *See id.* As plaintiff acknowledged in his deposition, the Thruway offered plaintiff five BMS I positions, and two promotions to BMS II, in locations requested by plaintiff, outside the Syracuse Division. Several of these positions were offered to plaintiff before he had even been released to

return to work. Clearly, the Thruway would not offer plaintiff a position, let alone a promotion, if the Thruway perceived plaintiff to be substantially limited in his ability to work.

**\*12** Additionally, in regard to plaintiff's assertion that prior to July 1995 the Thruway regarded him as having a mental impairment which substantially limits him the major life activity of working, the Court finds plaintiff's argument fails for the substantially same reason as above, none of plaintiff's assertions amount to an allegation that the Thruway perceived him as substantially limited in the major life activity of working. In support of his contention, plaintiff asserts that he was required to undergo a psychiatric examination and was treated less favorably than Hennessey, the other BMS I, after the examination. Although, as plaintiff acknowledges, the Thruway's action in mandating a psychiatric examination does not alone show that he was regarded as disabled, it can be considered along with plaintiff's other allegations in ascertaining whether the Thruway regarded him as disabled. *See Cody v. CIGNA Health Care of St. Louis, Inc.,* 139 F.3d 595, 599 (8th Cir.1998). The Court notes in regard to the mandated examination, that the Thruway's psychiatrist found and communicated to plaintiff's superiors that plaintiff was fully able to perform his duties. Plaintiff contends that after the examination, the Thruway assigned him projects, only to later switch them with Hennessey's projects, that the Thruway assigned him a less experienced work crew than Hennessey, and finally, that the Thruway, instead of allowing plaintiff to be in charge when the BMS II was absent, as he had been in the past, required plaintiff to begin rotating with Hennessey, the other BMS I, on those occasions. Plaintiff also contends that the Thruway did not give him the promotion to temporary BMS II in July 1995, when the permanent BMS II fell ill. The Court finds that plaintiff has not shown that the Thruway, at any time prior to July 1995, perceived him as substantially limited in performing the major life activity of working, because the Thruway still entrusted him with the duties of a BMS I, which are to supervise a work crew and repair and maintain Thruway bridges. Although plaintiff's projects may have been switched, the Thruway still required him to carry out his BMS I duties. Furthermore, the level of experience of his crew has little to do with the Thruway's alleged perception that he was disabled. If anything, the Court finds that it supports the proposition that the Thruway perceived him as capable of performing his work, because an inexperienced work crew would not be assigned to an individual regarded as disabled because the Thruway would need to assign a more experienced crew to one it perceived as substantially limited in the major life activity of working. The Court finds that the alleged change in Thruway policy in regard to which BMS I was in charge when the BMS II was absent does not evidence a perception of disability,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

because any responsibilities of filling in for a supervisor go above the duties of a BMS I, and were not actually taken away from plaintiff, he was only asked to share them. Further, the Court finds that the Thruway passed over plaintiff and made his "nemesis," Hennessey, the temporary BMS II does not demonstrate that the Thruway perceived plaintiff to be substantially limited in the major life activity of working, because the Thruway still required plaintiff to fulfill his BMS I duties. [FN9]

> FN9. Although plaintiff specifically alleges in his complaint that the Thruway regarded him as disabled prior to July 1995, to the extent that plaintiff appears to argue in his memorandum of law that, regardless of whether he suffered a disability within the meaning of the statute, he continued to be regarded as disabled after July 1995, and thus was discriminated against, when Hennessey was permanently hired as the BMS II in December 1995 instead of plaintiff, and that plaintiff was denied a reasonable accommodation, and ultimately terminated because the Thruway regarded him as suffering an impairment that substantially limited him the major life activity of working.

*13 Accordingly, plaintiff fails to establish a *prima facie* case of discrimination under the Rehabilitation Act because he has not proved either that he was disabled, or that he was, at any time, regarded as such by his employer. Consequently, plaintiff's discrimination claims pursuant to the Rehabilitation Act must be dismissed. [FN10]

> FN10. The Court notes that even if plaintiff were able to prove the first element of his *prima facie* case, his discrimination claim would still fail because he rejected all of the Thruway's offers of reasonable accommodation. *See Gronne*, 2000 U.S. Dist. LEXIS 3546, at * 18-19 (holding that the plaintiff was not a "qualified person with a disability" under the ADA, and therefore dismissing her discrimination claims, because she rejected the reasonable accommodations the defendant offered).

D. *Retaliation under the Rehabilitation Act*

Retaliation against individuals asserting rights under the Rehabilitation Act is prohibited. An individual may still pursue a retaliation claim even if the underlying claim of disability discrimination fails. *See Mesnick v. General Elec. Co.*, 950 F.2d 816, 827 (1st Cir.1991); *Treglia v. Town of Manlius*, 68 F.Supp.2d 153, 158 (N.D.N.Y.1999).

Initially, plaintiff bears the burden of proving a *prima facie* case of retaliation. Plaintiff must show: (1) he was engaged

in protected activity; (2) his employer was aware of the activity; (3) his employer took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. *See Sands v. Runyon*, 129 F.3d 114, 114 (2d Cir.1997).

If plaintiff can make out a *prima facie* case of retaliation, the burden of proof shifts, and defendant must then present legitimate, non-discriminatory reasons for the adverse employment action. *See id.* If defendant can do so, the burden of production then shifts back to plaintiff to demonstrate that the proffered reason is a pretext. *See id.* At all times, however, plaintiff has the ultimate burden of persuasion. *See id.*

Plaintiff claims that the Thruway violated the Rehabilitation Act by denying him a promotion and a reasonable accommodation, and terminating him in retaliation for filing age discrimination complaints, making complaints to supervisors, and filing a request for a reasonable accommodation.

1. *Protected Activity*

Plaintiff must have engaged in activity specifically protected by the Rehabilitation Act to satisfy the first element of his *prima facie* case of retaliation. Since the Rehabilitation Act protects the disabled from discrimination, anyone who exercises a right or privilege under the statute, or opposes a practice that violates the Rehabilitation Act, is engaging in protected activity. Protected activity includes not only the filing of formal charges of discrimination, but also the informal protests of an employer's discriminatory practice, such as, "making complaints to management," and the request for a reasonable accommodation. *Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d. Cir.1990); *see Grant v. Hazelett Strip- Casting Corp.*, 880 F.2d 1564 (2d Cir.1989); *Sacay v. Research Found. of the City Univ. of N.Y.*, 44 F.Supp.2d 496, 504 (2d Cir.1999). Plaintiff, however, need not prove the merits of his discrimination complaints to establish he was engaged in protected activity, "but only that he was acting under a good faith, reasonable belief that a violation existed." *Sumner*, 899 F.2d at 209.

*14 Plaintiff argues that he engaged in activity protected by the Rehabilitation Act in several ways. First, plaintiff avers that he invoked the protection of the Rehabilitation Act by filing age discrimination complaints with the EEOC, and New York Division of Human Rights. Although plaintiff stated on the face of the complaints that he was disabled, he only alleged that he was discriminated against because of his age and veteran status. Therefore, because the Rehabilitation Act protects against disability discrimination,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

not age discrimination, the filing of these complaints, as acknowledged by plaintiff's counsel during oral argument, is not protected activity for the purpose of plaintiff's present retaliation claims.

Second, plaintiff asserts that his complaints to supervisors constitute protected activity. Plaintiff complained to supervisors about harassment by co- workers who were aware that plaintiff was sent for a psychiatric evaluation, and met with a clinical psychologist. In the Court's view, most of plaintiff's allegations of harassment reflect more meanness of spirit on the part of plaintiff's co-workers, than discrimination based on a perceived mental impairment. Viewing the facts in the light most favorable to plaintiff, however, the Court finds that there are three incidents where plaintiff's complaints to supervisors could be construed as a response to disability-based harassment, and thus protected activity. The first incident took place in August 1989, when co-workers hung a parachute with a toilet paper roll from the ceiling of the Syracuse Bridge Shop and suggested, *inter alia,* that "no normal person jumps out of a perfectly good airplane." The Court notes that plaintiff testified in his deposition that he believed the parachute to be a derogatory reference to his former position as an Army paratrooper, but finds that a jury could reasonably construe this comment as proof that plaintiff's co-workers believed he suffered mental problems. The same is true with respect to plaintiff's allegation that he complained to his supervisors in September 1990 about co-workers referring to him as "squirrels" and "nuts." Plaintiff's complaints to supervisors about undergoing a psychiatric examination, though not in regard to harassment, are also protected activity, because plaintiff made them in response to what he perceived as disability-based discrimination by the Thruway. These types of informal complaints to management regarding arguably disability-based discrimination fall within the ambit of protected activity under the Rehabilitation Act. *See Sumner,* 899 F.2d at 209.

Finally, plaintiff argues that his request for a reasonable accommodation is protected activity. Although, for reasons discussed further below, the Court finds that plaintiff was not actually denied a reasonable accommodation, and is therefore precluded from asserting 'denial' of reasonable accommodation' as an adverse employment action, the Court finds that a reasonable jury could conclude that plaintiff's *requests* for relocation to another position within the Thruway constitute protected activity under the Rehabilitation Act inasmuch as plaintiff believed he was asserting his rights under the statute. *See Sacay,* 44 F.Supp.2d at 504 ("Protected activities include ... under federal laws, the request for reasonable accommodations); *see also Sumner,* 899 F.2d at 209 (holding that the plaintiff, to establish that his activity is protected, need only prove that "he was acting under a good faith, reasonable belief that

a violation existed.").

2. *Employer's Awareness of Protected Activity*

*15 Since there is no dispute that the Thruway was aware of all of plaintiff's activities, the Court need not address this element further.

3. *Adverse Employment Action*

An adverse employment action is a materially adverse change in the terms and conditions of employment, such as termination of employment. *See Treglia,* 68 F.Supp.2d, at 159. Plaintiff contends he suffered an adverse employment action when he was denied a promotion to the BMS II position in the Syracuse Division. "The denial of a promotion is an adverse employment action," thus, plaintiff has established that he suffered an adverse employment action sufficient to support a retaliation claim. *Hunt v. City of Markham,* 213 F.3d 649, 654 (7th Cir.2000)(citing *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). [FN11]

> FN11. While plaintiff is correct that as denial of a request for a reasonable accommodation can be an adverse employment action, (*See Sacay,* 44 F.Supp.2d at 504), the Court finds that plaintiff was not actually denied a reasonable accommodation in this case. Plaintiff desired either placement in a position, other than in bridge maintenance, within the Syracuse Division, or relocation to another Thruway Division. Instead of directly offering plaintiff a reasonable accommodation, the Thruway advised him to place his name on a transfer list. Plaintiff did so, and the Thruway promptly offered him four BMS positions in other Thruway Divisions, essentially honoring plaintiff's request. Plaintiff rejected each offer. Because the Court finds plaintiff has alternative grounds for establishing adverse employment action, the Court need not further address plaintiff's claim that the Thruway denied him a reasonable accommodation in retaliation for engaging in protected activity.

In addition, plaintiff alleges that his ultimate termination constitutes an adverse employment action sufficient to satisfy this prong of plaintiff's *prima facie* case. The Court agrees. *See Treglia,* 68 F.Supp.2d at 159 ("An adverse employment action sufficient to support a retaliation claim is a materially adverse change in the terms, privileges, duration and conditions of employment.").

4. *Causal Connection*

A causal connection between the protected activity and the adverse employment action may be established indirectly

through circumstantial evidence, for example, "by showing that a protected interest was closely followed in time by adverse action." *Treglia,* 69 F.Supp.2d at 159; *see Sumner,* 899 F.2d at 209. The court will examine the causal connection between the plaintiff's protected activities and the two remaining retaliation claims, denial of promotion, and termination.

First, plaintiff must establish a causal connection between his complaints to supervisors, and the denial of promotion to BMS II. [FN12] Plaintiff complained to supervisors in 1989 and 1990 about the alleged harassment by co- workers and his treatment as a disabled person. Plaintiff was denied the BMS II promotion in 1995. The Court finds that five years between the protected activity and alleged retaliatory action is too vast an expanse of time from which to infer a causal connection. Thus, plaintiff fails to establish a *prima facie* case of retaliation in regard to his denial of promotion.

> FN12. Although, plaintiff's request for a reasonable accommodation is a protected activity, it is not relevant to the present discussion of whether there is a causal connection between the denial of the promotion and plaintiff's protected activity, because plaintiff was denied the promotion prior to making a request for a reasonable accommodation.

Similarly, the six year span between plaintiff's complaints to supervisors in 1989 and 1990 and his termination in 1996 is too long a period to infer a causal connection.

Plaintiff must also establish a causal connection between his request for a reasonable accommodation and his termination. The record suggests that plaintiff may have continued to request a reasonable accommodation through November 1996. The Thruway initiated termination proceedings in December 1996. It is undisputed that in November 1996, the Thruway attempted to offer plaintiff a permanent BMS I position at the New England Bridge, only to be refused. Even assuming, *arguendo,* that plaintiff requested a reasonable accommodation in November 1996, after rejecting the New England Bridge position, the Thruway's offer of such a position dispels any inference of retaliation against plaintiff for requesting an accommodation. A reasonable jury could not conclude that there is a causal connection between plaintiff's request for accommodation and his termination in November 1996, where the record demonstrates the Thruway honored plaintiff's repeated requests for an accommodation during that same month. Plaintiff's failure to make out a *prima facie* case of retaliation is fatal to his Rehabilitation Act claim.

IV. *CONCLUSION*

**\*16** Resolving all inferences and ambiguities in favor of

plaintiff, the Court can find no material issue of fact. Therefore, for the foregoing reasons, the Court finds that the Thruway is entitled to summary judgment.

Having dismissed all of plaintiff's federal claims and there being no basis for the Court to exercise diversity jurisdiction over the parties, the Court declines to exercise its pendent jurisdiction to entertain plaintiff's remaining state law claims. Thus, the Thruway's motion for summary judgment is hereby GRANTED; and it is further

ORDERED that summary judgment be entered for defendant; and it is further

ORDERED that plaintiff's complaint be dismissed.

It is so ORDERED.

2001 WL 874785 (N.D.N.Y.), 20 NDLR P 125

END OF DOCUMENT

# EXHIBIT B

●                              ●

**Page    1**

Citation                    Search Result        Rank(R) 1 of 2        Database
H.R. CONF. REP. 103-213                                                USCCAN-REP
H.R. Conf. Rep. No. 213, 103RD Cong., 1ST Sess. 1993, 1993 WL 302291 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 103-213,  1993 U.S.C.C.A.N. 1088)**

**\*\*1088** P.L. 103-66, **\*1** OMNIBUS BUDGET RECONCILIATION ACT OF 1993
DATES OF CONSIDERATION AND PASSAGE
House: May 27, August 5, 1993
Senate: June 23, 24, 25, August 6, 1993
Cong. Record Vol. 139 (1993)
House Report (Budget Committee) No. 103-111,
May 25, 1993 (To accompany H.R. 2264)
House Conference Report No. 103-213,
Aug. 3, 1993 (To accompany H.R. 2264)

HOUSE CONFERENCE REPORT NO. 103-213
August 4, 1993
[To accompany H.R. 2264]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 2264) to provide for reconciliation pursuant to section 7 of the concurrent resolution on the budget for fiscal year 1994, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Omnibus Budget Reconciliation Act of 1993".

SEC. 2. TABLE OF CONTENTS.

The table of contents is as follows:

**\*2** TITLE I-AGRICULTURE AND RELATED PROVISIONS

TITLE II-ARMED SERVICES PROVISIONS

TITLE III-BANKING AND HOUSING PROVISIONS

TITLE IV-STUDENT LOANS AND ERISA PROVISIONS

TITLE V-TRANSPORTATION AND PUBLIC WORKS PROVISIONS

TITLE VI-COMMUNICATIONS LICENSING AND SPECTRUM ALLOCATION PROVISIONS

TITLE VII-NUCLEAR REGULATORY COMMISSION PROVISIONS

TITLE VIII-PATENT AND TRADEMARK OFFICE PROVISIONS

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

H.R. CONF. REP. 103-213
**(Cite as: H.R. CONF. REP. 103-213, \*763,  1993 U.S.C.C.A.N. 1088, \*\*1452)**

### Conference Agreement

(a) Establishment of Primary Care Category.-The conference agreement includes the House E&C provision with an amendment relating to anesthesia services. The agreement specifies that for purposes of calculating the Medicare volume performance standards, anesthesia services are included in the surgical services category beginning in fiscal year 1994. This will affect calculation of the conversion factor update beginning with calendar year 1996. The anesthesia services moved into the category of surgical services are those that are paid on the basis of base and time units.

(b) Reduction in Default MVPS and Updates.-The conference agreement includes the House E&C provision.

3. Phased-in Reduction in Practice Expense Relative Value Units for Certain Services (Sec. 5004 of House bill; and sec. 7203 of Senate amendment)

### Present Law

Under current law Medicare payments for physicians' services are based on three components: 1) a work component; 2) a practice expense component; and 3) a malpractice component. Relative values are determined for each component and combined into a single relative value for each service. While the relative values for the work component of physicians' services are based on resource costs, relative values for practice and malpractice expenses are based on historic charges.

### House Bill

W&M: No provision.

\*\*1453 \*764 E&C: The Secretary would phase-in reductions to the practice expense relative value units (RVUs) for certain services. Specifically, for a given service, the number of practice expense RVUs would be reduced if they exceed 110 percent of the number of work RVUs. Beginning in 1994, 25 percent of the difference between practice cost RVUs and work RVUs would be eliminated. Further differences would be eliminated in 25 percent increments over the succeeding two years. In no case would practice cost RVUs for any service be reduced below 110 percent of the work RVUs.

Reductions in practice cost RVUs would not be applied to services without a work component, to anesthesia and radiology services or to services provided in an office setting at least 75 percent of the time.

The Secretary would be required to develop a methodology for implementing in 1997 a resource-based system for determining practice expense RVUs. The Secretary would be required to submit a report to Congress on the methodology by June 30, 1996.

### Senate Amendment

**Similar** to **E&C provision except** that **anesthesiology** and radiology services would not be exempt from the application of the rules for reducing RVUs.

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works



H.R. CONF. REP. 103-213
(Cite as: H.R. CONF. REP. 103-213, *764, 1993 U.S.C.C.A.N. 1088, **1453)

### Conference Agreement

The conference agreement includes the Senate amendment with an amendment to specify that the practice expense relative value units may not be reduced to a number less than 128 percent of the number of work relative value units. The agreement does not require the Secretary to develop a resource-based system for determining practice expense RVUs.

4. Limitation on Payments for Medically Directed CRNAs and for the Anesthesia Care Team (Secs. 13471 and 5005 of House bill; sec. 7204 of Senate amendment)

### Present Law

A significant proportion of anesthesia services in the United States are provided by anesthesia care teams consisting of an anesthesiologist supervising two or more certified registered nurse anesthetists (CRNAs). When anesthesia services are provided by a team, Medicare payments to the supervising anesthesiologist are based on reduced base and time units. The law specifies that the base units are reduced by 10 percent for supervision of two concurrent procedures, 25 percent for supervision of three concurrent procedures, and forty percent for supervision of four concurrent procedures. When services are personally performed by an anesthesiologist, time units are measured in fifteen minute periods; for medically-directed services, time units are measured in 30 minute intervals. The law specifies that time units are to be counted based on actual time rather than rounded to full time units.

Payments to the CRNA are based on a separate fee schedule with its own dollar conversion factor. Time units for medically-directed services are based on 30 minute intervals.

**1454 *765 As a result of this payment policy, payments for a procedure to an anesthesia care team are significantly higher than payment would be to a single anesthesiologist. According to the Physician Payment Review Commission (PPRC), in most payment areas, payments to a team consisting of one anesthesiologist supervising two CRNAs are 20 percent to 30 percent higher than payments to a single anesthesiologist.

OBRA 90 set payment levels for medically directed CRNAs at 70 percent of the amount paid to physicians. These services are paid on the basis of a fee schedule which contains a dollar conversion factor. OBRA 90 specified the conversion factors through 1997 based on the amount physicians were estimated to be paid for these services. Since that time, however, the actual amounts paid to physicians for these services have been lowered as a result of refinements to physician payments. As a result, the dollar conversion factors specified in the law are greater than 70 percent.

### House Bill

W&M: The conversion factor used to determine payments to medically-directed CRNAs would be frozen at $10.75, from 1993 through 1997. In subsequent years, the percentage update for these services would be the same as for physician anesthesia services.

E&C: For anesthesia services provided by anesthesia care teams on or after

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

H.R. CONF. REP. 103-213
(Cite as: H.R. CONF. REP. 103-213, *765,  1993 U.S.C.C.A.N. 1088, **1454)

January 1, 1994, payments would be limited to 120 percent of the fee that would be made to a single anesthesiologist in the same locality. This anesthesia care team fee for a procedure would be equally divided between the supervising anesthesiologist and the CRNA. In each of the succeeding four calendar years the anesthesia care team payment would be reduced by 5 percent, so that in 1998, payments to the anesthesia care team would be limited to 100 percent of the fee for a single anesthesiologist in the same locality. The provision would also repeal the reduction in the number of base units paid to anesthesiologists medically directing CRNAs.

### Senate Amendment

    Identical to E&C provision.

### Conference Agreement

    The conference agreement includes the Senate amendment with an amendment. For services furnished on or after January 1, 1994, the methodology for determining base and time units is the same for services furnished by physicians, for physician medical direction of two, three or four CRNAs, or for services furnished by CRNAs (whether or not medically directed). The calculation is to be based on the methodology currently in effect for anesthesiology services furnished by physicians.

**1455 *766 5. Reinstating Separate Payment for the Interpretation of Electrocardiograms (EKGs) (Secs. 13441 and 5007 of House bill; sec. 7205 of Senate amendment)

### Present Law

    OBRA 90 eliminated separate payments for interpretation of EKGs performed or ordered to be performed as part of, or in conjunction with, a medical visit or consultation, effective January 1, 1992.

### House Bill

    W&M: The prohibition on separate payments for interpretation of EKGs would be repealed. Separate fee schedule payment amounts for interpreting EKGs in all settings would be established. The proposal provides for several adjustments to the fee schedule in order to comply with budget neutrality rules.
    The Secretary would subtract the relative value units for EKG interpretation that were bundled into medical visits and consultation relative values. The Secretary would be required to reduce the relative value for all services (except anesthesia services) so that beginning in 1996 expenditures under the fee schedule would not exceed those which would have been made in the absence of this provision. For anesthesia services, the adjustment would be made to the conversion factor. Adjustments also would be made to the historical payment basis in the fee schedule to account for the fact that more EKG interpretations would be paid at the full fee schedule amount than medical visits and consultations during the transition.

          Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

# EXHIBIT C

LEXSEE 1997 US DIST LEXIS 21402

**United States of America, ex rel. Minnesota Association of Nurse Anesthetists,
Plaintiff, v. Allina Health System Corp., Unity Hospital, Mercy Hospital, John
Murphy, Midwest Anesthesiologists, P.A., Metropolitan Anesthesia Network, Allen
Tank, Health Billing Systems, Inc., Thelma M. Albay, M.D., Gary Baggenstoss, M.D.,
Minda Castillejos, M.D., David Cumming, M.D., Teri Heil, M.D., Sang Hong, M.D.,
Ted Janossy, M.D., Raymond Kloepper, II, M.D., John Magdsick, M.D., Thomas
Maggs, M.D., Thomas Polta, M.D., John Roseberg, M.D., Jai Suh, M.D., Mark Sperry,
M.D., Jeffrey Yue, M.D., and John Rydberg M.D., St. Cloud Hospital, Anesthesia
Associates of St. Cloud Ltd., Gary A. Boeke, M.D., Philip F. Boyle, M.D., L. Michael
Espeland, M.D., Alan D. Espelien, M.D., Paul J. Halverson, M.D., Craig Johnson,
M.D., Lanse C. Lang, M.D., A. Wade McMillan, M.D., William H. Rice, M.D., Allan
Reitz, M.D., Annette E. Zwick, M.D., Anesthesiology, P.A., Abbott Northwestern
Hospital, Northwest Anesthesia, P.A., Bryce Beverlin, M.D., Richard Blomberg, M.D.,
Jean Boening, M.D., Mitchell Burke, M.D., Rajarao Dwarakanath, M.D., Richard
Engwall, M.D., James Gayes, M.D., Luis Giron, M.D., Nancy Groves, M.D., Jonathan
Gudman, M.D., Richard Johnson, M.D., John Lillehei, M.D., Robert McKlveen, M.D.,
Judith Meisner, M.D., Michael Menzel, M.D., James Musich, M.D., Mark Nissen,
M.D., Xavier Pereira, M.D., David Plut, M.D., Jeffrey Shaw, M.D., Richard Skoog,
M.D., William Stauffer, M.D., Ofelio Tiu, M.D., Robert Tronnier, M.D., John
Wintermute, M.D., and [other unknown defendants], Does I through XX, Defendants.**

Civil No. 4-96-734

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA,
FOURTH DIVISION**

*1997 U.S. Dist. LEXIS 21402*

**March 3, 1997, Decided
March 3, 1997, Filed**

**DISPOSITION:** [*1] Defendants' motions to dismiss
for lack of subject matter jurisdiction DENIED.
Defendants' motions to dismiss for failure to plead with
particularity as pursuant to Federal Rule of Civil
Procedure 9(b), GRANTED. Plaintiffs' complaint
DISMISSED WITHOUT PREJUDICE. Defendants'
motions to dismiss based upon Rule 12(b)(6) DENIED
WITHOUT PREJUDICE.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For MINNESOTA ASSOCIATION OF
NURSE ANESTHETISTS, United States of America, ex
rel, plaintiff: William S Rosen, Rosen & Rosen, St. Paul,
MN. Herbert J Stern, Stern & Greenberg, Roseland, NJ.

For ALLINA HEALTH SYSTEM CORP., UNITY
HOSPITAL, MERCY HOSPITAL, JOHN MURPHY,
defendants: Richard A Duncan, Jay David Christiansen,
John Dwyer French, Elizabeth Hendricks Schmiesing,
Faegre & Benson, Minneapolis, MN.

For MARK SPERRY, M.D., GARY BATGENSTOSS,
M.D., JOHN RYDBERG, M.D., MIDWEST
ANESTHESIOLOGISTS, P.A., METROPOLITAN
ANESTHESIA NETWORK, THELMA M ALBAY,
M.D., MINDA CASTILLEJOS, M.D., TERI HEIL, M.D.,
SANG HONG, M.D., TED JANOSSY, M.D.,
RAYMOND KLOEPPER, II, M.D., JOHN MAGDSICK,
M.D., THOMAS MAGGS, M.D., THOMAS POLTA,
M.D., JOHN ROSEBERG, M.D., JAI SUH, M.D.,

 

JEFFREY YUE, M.D., defendants: Laurie Jean Miller, Thomas S Fraser, Cynthia A [*2] Jokela, Fredrikson & Byron, Minneapolis, MN.

For JAMES CUMMING, M.D., defendant: Laurie Jean Miller, Fredrikson & Byron, Minneapolis, MN.

For DAVID CUMMING, M.D., defendant: Thomas S. Fraser, Cynthia A Jokela, Fredrikson & Byron, Minneapolis, MN.

For HEALTH BILLING SYSTEMS, INC., ALLEN TANK, defendants: Janice Marie Symchych, Christopher T Shaheen, Dorsey & Whitney, Minneapolis, MN. Laurie Jean Miller, Thomas S Fraser, Cynthia A Jokela, Fredrikson & Byron, Minneapolis, MN.

For CRAIG JOHNSON, M.D., defendant: Joseph Myles Musilek, Eric Christian Tostrud, Lockridge Grindal Nauen & Holstein, Minneapolis, MN.

For ST. CLOUD HOSPITAL, defendant: Kevin J Hughes, Paul R Harris, Kevin M. O'Driscoll, Hughes Mathews & Didier, St. Cloud, MN.

For ANESTHESIA ASSOCIATES OF ST. CLOUD LTD., GARY A BOEKE, M.D., PHILIP F BOYLE, M.D., L MICHAEL ESPELAND, M.D., ALAN D ESPELIEN, M.D., PAUL J HALVERSON, M.D., LANSE C LANG, M.D., A WADE MCMILLAN, M.D., WILLIAM H RICE, M.D., ALLAN REITZ, M.D., ANNETTE E ZWICK, M.D., defendants: Joseph Myles Musilek, Richard A Lockridge, Eric Christian Tostrud, Lockridge Grindal Nauen & Holstein, Minneapolis, MN.

For ANESTHESIOLOGY, P.A., [*3] defendant: David Powell Graham, Kevin M Lindsey, Oppenheimer Wolff & Donnelly, St. Paul, MN. Margo S Struthers, Bradley Grayson Clary, Oppenheimer Wolff & Donnelly, Minneapolis, MN.

For ABBOTT NORTHWESTERN HOSPITAL, INC., defendant: Richard A Duncan, Jay David Christiansen, John Dwyer French, Elizabeth Hendricks Schmiesing, Faegre & Benson, Minneapolis, MN.

For NORTHWEST ANESTHESIA, P.A., defendant: Dayle Nolan, Alan Marshall Anderson, John A Cotter, Christopher K Larus, Larkin Hoffman Daly & Lindgren, Bloomington, MN.

For BRYCE BEVERLIN, M.D., RICHARD BLOMBERG, M.D., JEAN BOENING, M.D., MITCHELL BURKE, M.D., RAJARAO DWARAKANATH, M.D., RICHARD ENGWALL,

M.D., JAMES GAYES, M.D., LUIS GIRON, M.D., NANCY GROVES, M.D., JONATHAN GUDMAN, M.D., RICHARD JOHNSON, M.D., JOHN LILLEHEI, M.D., ROBERT MCKLVEEN, M.D., JUDITH MEISNER, M.D., MICHAEL MENZEL, M.D., JAMES MUSICH, M.D., MARK NISSEN, M.D., XAVIER PEREIRA, M.D., DAVID PLUT, M.D., JEFFREY SHAW, M.D., RICHARD SKOOG, M.D., WILLIAM STAUFFER, M.D., OFELIO TIU, M.D., ROBERT TRONNIER, M.D., JOHN WINTERMUTE, M.D., defendants: John A Cotter, Larkin Hoffman Daly & Lindgren, Bloomington, MN.

For UNITED STATES OF AMERICA, movant: [*4] Lynn A Zentner, US Atty Office, Minneapolis, MN. Michael F Hertz, Joyce R Branda, Joel D Hesch.

**JUDGES:** Ann D. Montgomery, UNITED STATES DISTRICT COURT.

**OPINIONBY:** Ann D. Montgomery

**OPINION:**

### MEMORANDUM OPINION AND ORDER

### INTRODUCTION

The above-entitled matter came on for hearing before the undersigned United States District Judge on November 8, 1996 pursuant to all Defendants' motions to dismiss Plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b). Plaintiffs' five count second amended complaint alleges Defendants conspired to, and did engage in, false billing and fraudulent billing in violation of the Federal False Claims Act, *31 U.S.C. § 3729*(a)(1).

### BACKGROUND

**I. The Parties**

A) Plaintiffs

Plaintiffs, the Minnesota Association of Nurse Anesthetists ("MANA") is an association of professional Certified Registered Nurse Anesthetists in Minnesota. (Second Amended Complaint ("Compl.") P 3). The association was formed to promote and protect the legal rights of its members. (Id.).

B) Defendants

Defendants are comprised of various Hospitals, administrators, anesthesiology practice groups, and medical doctor [*5] anesthesiologists. By virtue of their attorney representation, Defendants are best divided into six groups.

 
1. The "Allina" Defendants, comprised of: Allina, which is an integrated health care system; Unity and Mercy Hospital; and John Murphy, Vice President of Unity and Mercy Hospitals. (Id. PP 7-10).

2. The "Midwest Anesthesiologists, P.A." ("MAPA") Defendants, comprised of: MAPA, a professional association which provides anesthesia services to Unity and Mercy Hospitals; Metropolitan Anesthesia Network; Allen Tank, a business manager with MAPA; Health Billing Systems, a billing service for MAPA employees; and several doctor anesthesiologists who maintained privileges at Unity and/or Mercy Hospitals and who are members of MAPA - Thelma Albay; Gary Baggenstoss; Minda Castillejos; David Cumming; Teri Heil; Sang Hong; Ted Janossy; Raymond Kloepper; John Magdsick; Thomas Maggs; Thomas Polta; John Roseberg; Jai Suh; Mark Sperry; Jeffrey Yue; and John Rydberg. (Id. PP 11-16).

3. Defendant St. Cloud Hospital. (Id. P 17).

4. The "St. Cloud Anesthesiologists" Defendants, comprised of: Anesthesia Associates of St. Cloud, a professional partnership whose anesthesiologist members [*6] maintain privileges at St. Cloud Hospital; and the doctor anesthesiologists of Anesthesia Associates - Gary Boeke; Philip Boyle; L. Michael Espeland; Aland Espelien; Paul Halverson; Craig Johnson; Lease Lang; A. Wade McMillan; William Rice; Allan Reitz; and Annette Zwick. (Id. PP 18-19).

5. Defendant Anesthesiology, P.A., a professional association which provides anesthesia services. (Id. P 21).

6. The "Abbott Northwestern" Defendants, comprised of: Abbott Northwestern Hospital ("Abbott"), a hospital owned by Defendant Allina; Northwest Anesthesia, P.A. ("NAPA"), a professional corporation which provides anesthesia services to Abbott; and doctor anesthesiologists who maintained privileges at Abbott and are members and/or employees of NAPA - Bryce Beverlin; Richard Blomberg; Jean Boening; Mitchell Burke; Rajarano Dwarakanath; Richard Engwall; James Gayes; Luis Giron; Nancy Groves; Jonathan Gudman; Richard Johnson; John Lillehei; Robert McKlveen; Judith Meisner; Michael Merizel; James Musich; Mark Nissen; Xavier Pereira; David Plut; Jeffrey Shaw; Richard Skoog; William Stauffer; Ofelio Tiu; Robert Tronnier; and John Wintermute. (Id. PP 22-24).

Plaintiffs also named fictitious [*7] Defendants Does I through XX.

## II. Procedural History

Plaintiffs filed the above-entitled action under seal on December 28, 1994, pursuant to *31 U.S.C. § 3730*(b) of the False Claims Act. (Compl. P 4). The United States

investigated the claims in the complaint and on May 17 1995, the Government determined not to prosecute the action, but authorized Plaintiffs to proceed with the case on behalf of the United States. (Id. P 5). Thereafter, the Court unsealed the complaint and Defendants were served with a copy of the complaint. Defendants have not answered the complaint, rather Defendants moved the Court to dismiss Plaintiffs' action.

The present motion to dismiss has suffered a Sisyphean journey in its attempt to be heard. The parties first briefed and then argued the motion to dismiss on September 27, 1995 before Judge Michael J. Davis. Plaintiffs also requested at that time to file a second amended complaint. The second amended complaint sought to join Abbott, NAPA, and physician members of NAPA as additional defendants.

On November 9, 1995, Judge Davis granted Plaintiffs' motion to file a second amended complaint. However, anticipating that this case would be transferred, [*8] Judge Davis denied Defendants' motion to dismiss without prejudice and with leave to refile the motions before the new judge. (Doc. No. 92). Ultimately however, the case was not transferred.

Defendants accordingly filed an amended motion to dismiss with Judge Davis. By Order dated January 10, 1996, Judge Davis determined that Defendants' motions to dismiss would be decided on the papers without additional oral arguments. (Doc. No. 104). The parties thereafter submitted additional briefs and all briefing was completed by February 15, 1996. On August 13, 1996, again in anticipation of transfer, Judge Davis denied Defendants' motions to dismiss without prejudice and with leave to file the motions with this Court. (Doc. No. 155). On November 8, 1996, this Court heard Defendants' motion to dismiss.

## II. Factual Background

The administering of anesthetics is provided to patients by two groups: Certified Registered Nurse Anesthetists ("CRNAs") and Medical Doctor Anesthesiologists ("MDAs"). Anesthesia services can be provided to a patient by either a CRNA or a MDA, or by both. The underlying case before the Court arises from the ambiguous, and apparently contentious, relationship [*9] between CRNAs and MDAs and their respective roles in administering anesthetics to patients and the manner in which those services are billed.

Anesthesia services historically have been reimbursed; not only for service provided, but also on the basis of time spent providing the service. Over the last decade there have been several revisions to the reimbursement procedure for compensating both MDAs and CRNAs. n1 In 1983, the Health Care Finance


Administration ("HCFA"), promulgated a set of laws which divided the provision of anesthesia services by MDAs into two types: 1) "direct/personal performance" of anesthesia; and 2) "medical direction" of multiple procedures where the anesthesia is administered by a different anesthesia provider, such as CRNAs. "Direct performance" procedures allowed for full reimbursement to the MDA. "Medical direction" services provided for partial reimbursement. In order to receive reimbursement for medical direction of several procedures, the MDA was required to satisfy several conditions.

> n1 Only a brief history of these changes are related in this fact section. Argument concerning, and a detailed analysis of, the language of the reimbursement provisions is best left for dispositive motions.

[*10]

Subsequently, the Omnibus Budget Reconciliation Act ("OBRA") of 1986, effective January 1, 1989, permitted CRNAs to bill Medicare directly for their services. n2 OBRA also altered the manner in which anesthesiologists were reimbursed for their services by permitting MDAs to bill 100% of the time spent with a single patient, absent involvement in concurrent cases, regardless of whether or not a CRNA was involved in the procedure.

> n2 Allegedly in practice, most CRNAs assigned their independent billing rights to their employer hospitals, which then billed Medicare for the CRNAs services. (Compl. P 38).

Plaintiffs allege that following the statutory billing changes, the MDAs fraudulently billed concurrent cases as single patient cases, and therefore increased the amount paid to them by Medicare. (Id.. P 39). As a result, members of MANA were then deprived of payment for services they allegedly rendered. (Id. § 51). Plaintiffs also allege that Defendants billed for the performance of concurrent cases [*11] without complying with the proscribed conditions for performing multiple procedures. (Id. P 46). Plaintiffs' consequently brought the above-entitled action.

Prior to filing the qui tam complaint, on November 8, 1994, Plaintiffs filed a sixteen count complaint alleging violations of Federal antitrust law, the Sherman Act and the Clayton Act. This antitrust complaint involves allegations against various defendant hospitals, anesthesiologists and anesthesiology practice groups.

Some of the Defendants involved in the antitrust suit are also named in the qui tam complaint.

**DISCUSSION**

**I. SUBJECT MATTER JURISDICTION**

The False Claims Act, *31 U.S.C. § § 3729-3733*, as amended in 1986, permits a private citizen (i.e. a "relator") acting on behalf of the United States to recover damages from defendants who knowingly make false claims, or submit false information for claims, of money or property to the United States. A study of the Act's history evidences a swinging pendulum of amendments as Congress sought to incorporate two policies that are both interrelated while at the same time separate: 1) encourage private citizen involvement in exposing fraud against [*12] the Government while, 2) preventing opportunistic suits by private persons who somehow learned of the fraud but did not assist in exposing the fraud. See *United States ex rel. Barth v. Ridgedale Elec., Inc., 44 F.3d 699, 702 (8th Cir. 1995).*

In an attempt to implement the policy of preventing actions by parasite plaintiffs, the statute divests the court of subject matter jurisdiction under certain circumstances. The Act provides:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Officer report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*31 U.S.C. § 3730*(e)(4)(A); *Barth, 44 F.3d at 702.*

The statute defines "original source" as meaning: "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action [*13] under this section which is based on the information." *31 U.S.C. § 3730*(e)(4)(B). A court determines the original source question *only if* it determines that plaintiff's action is based upon previously publicly disclosed information. *Barth, 44 F.3d at 699* (citations omitted). The initial analysis of jurisdiction for the present qui tam complaint requires a determination of whether there was "public disclosure" of the fraud and if so, whether or not Plaintiffs' complaint was "based upon" that public disclosure.


### A) Public Disclosure

For purposes of qui tam actions, "publicly disclosed" information is generally that information which is equally available to the relator as it is to strangers to the fraud, had they chosen to look for those facts. *United States ex rel. Stinson v. Prudential Ins., 944 F.2d 1149, 1155-56 (3rd Cir. 1991); United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 322 (2nd Cir. 1992)* ("accessibility by those not a party to the fraud [is] the touchstone of public disclosure"). As such, information contained in civil court pleadings, including discovery material actually made public through filing, is "publicly disclosed." [*14] *United States ex rel. Federal Recovery Servs. Inc. v. Crescent City E.M.S., Inc., 72 F.3d 447, 450 (5th Cir. 1995); Stinson 944 F.2d at 1160* (discovery documents were "publicly disclosed."); c.f. *United States ex rel. Springfield Terminal Ry. v. Quinn, 304 U.S. App. D.C. 347, 14 F.3d 645, 652 (D.C. Cir. 1994)* (discovery which has not been filed with the court is not publicly disclosed).

Public disclosure requires more than just public access to materials. Specifically, the Act's jurisdictional bar is given effect only when "the essential elements comprising that fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud." *United States ex rel. Rabushka v. Crane Co., 40 F.3d 1509, 1514 (8th Cir. 1994)* (citing *Springfield, 14 F.3d at 649-51)* (emphasis added). The Court in Springfield explained that the public disclosure must sufficiently illuminate "'allegations or transactions' of fraudulent conduct" and not just disclosure of "ordinary 'information'." *14 F.3d at 653.* n3 The Court in Springfield elaborated its point with the following illustration:

> If X + Y = Z, Z represents the *allegation* of fraud and [*15] X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.* the conclusion that fraud has been committed.

Id. at 654. Pursuing this illustration, it follows that when only X is accessible to the public, this is not sufficient by itself to suggest fraud, and therefore public disclosure of the fraud has not occurred. Id.

> n3 The Court in Springfield discussed the issue of "essential elements" pursuant to an analysis of "based upon." Nevertheless, the reasoning used by the Court in Springfield is applicable to a discussion of whether or not the "critical elements" of a fraud were published.

Defendants in this case allege four sources of public disclosure prior to Plaintiffs bringing the qui tam complaint: 1) Travelers Insurance Company's audit letter; 2) notebook of Drew D. Mathews; 3) antitrust complaint; and 4) news media reports.

#### (1) Travelers [*16] Audit

In October of 1991, Travelers Insurance Company, the Medicare Part B carrier for Mercy and Unity Hospitals, provided the hospitals with a letter alleging that the hospitals had been improperly billing Medicare for CRNA services where the MDAs had billed for personally performing services. (Duncan Aff., Exh. 2). The letter concluded that payments to the hospital for the CRNA services should not have been made and the hospital was asked to refund those amounts. (Id.).

Plaintiffs argue that the Travelers' audit does not constitute "public disclosure" of the fraud because the letter reveals exactly the opposite of the allegations contained in the qui tam suit. Specifically, the Travelers' letter erroneously concluded that the CRNAs were improperly billing for services, whereas the qui tam complaint alleges it was the MDAs who fraudulently billed for services performed by the CRNAs. Defendants maintain that the letter's reference to "inappropriate" billing gives rise to an inference of the fraud contained in Plaintiff's qui tam complaint sufficient to find that the fraud was "publicly disclosed."

This Court finds that the Travelers' audit letter does not sufficiently [*17] elucidate the "essential elements" of the fraudulent transaction so as to place the fraud in the public domain. *Rabushka, 40 F.3d at 1514.* The letter alleges a different perpetrator than the fraud asserted by Plaintiffs. There is no hint in the letter that the "inappropriate" billing might be the result of the MDAs not personally performing the services. In fact, the letter asserts that the Travelers' medical staff verified the MDAs involvement in each case. The letter at the very most raises a specter of "X" - fraudulent billing - in the fraudulent equation. But, the Travelers' letter does not provide the other critical elements of "Y" - the defrauding party or how the fraud occurred. The inferences in the letter, without the existence of other critical elements, insufficiently demonstrates the fraud of "Z." *Springfield, 14 F.3d at 654.* In the present case, the Travelers' audit does not sufficiently recite the critical elements of the fraud to constitute public disclosure under the Act. *Rabushka, 40 F.3d at 1514.*

#### 2) Notebook of Drew D. Mathews

Defendants n4 argue that the allegations detailed in the qui tam complaint were publicly disclosed in a notebook [*18] belonging to MANA member Drew D.



Mathews. Defendants explain that Mathews asserted that he recorded in the notebook the cases where he believed the MDAs submitted fraudulent bills. (Mathews Aff PP 1, 5). Defendants contend that this notebook should have been produced in the antitrust litigation under Rule 26. Defendants allege that had this notebook been produced it would constitute public disclosure of the fraud.

> n4 The issue of the notebook appears to be only addressed in Defendant NAPA's Memorandum in Support of Motion to Dismiss, January 26, 1996.

Discovery material must actually have been made public for it to be "publicly disclosed" under the statute. *Springfield, 14 F.3d at 652*. A mere six weeks divided the filing of the antitrust and qui tam complaints, and as such, discovery did not occur in the antitrust case before the filing of the qui tam action. (See Civil No. 3-94-1446). The Mathews' notebook was not produced through discovery before the commencement of the qui tam case. [*19] Since the notebook was not available for public review it was not "publicly disclosed" before MANA filed the qui tam complaint. n5

> n5 Defendant NAPA further argues that at the very least, the Mathews' notebook was disclosed by MANA when it filed Mathews' affidavit more than two months before MANA filed its second amended complaint adding NAPA to the action. As such, NAPA claims the allegations were publicly disclosed before MANA filed its action against NAPA. This argument is inapplicable because what is relevant is whether or not the information was publicly disclosed before the filing of the first complaint and not before the addition of parties. See in general the discussion infra part C.

**3&4) The Antitrust Complaint and News Media Reports**

The allegations of fraud were publicly disclosed in the antitrust complaint and in newspaper articles. *Crescent City, 72 F.3d at 450; Rabushka, 40 F.3d at 1512*. As such, the question becomes whether or not Plaintiffs' qui tam complaint is "based [*20] upon" this public disclosure.

**B) Based Upon** n6

> n6 The Act divests jurisdiction for "an action under this section **based upon** the public disclosure of allegations or transactions . . . ."

The publicly disclosed information at issue is language contained in the antitrust complaint and subsequent newspaper articles describing the claims of the antitrust action. n7 The antitrust complaint alleges in part:

> In addition to the foregoing and in combination therewith, the defendant anesthesiologist groups and their co-conspirators have engaged in a wide-spread practice of fraudulent billing of anesthesia services in violation of Minn. Stat. 147 § 147.091 and Federal statutes, including § 1128(a)(1)(A). Such violations include, but are not limited to, billing for services that they did not render, billing for operations at which they were not present and inaccurately designating operations as one-on-one for Medicare purposes.

(Antitrust Compl. P 66). Defendants correctly assert that [*21] the allegations of Medicare fraud in the publicly disclosed antitrust complaint are similar to the claims contained in the qui tam complaint. However, the issue is whether or not the qui tam complaint is "based upon" the information alleged in the antitrust action.

> n7 Because the newspaper articles simply report the information from the antitrust complaint, the proceeding analysis concerning the antitrust complaint equally applies to the newspaper reports.

An investigation into the meaning of the term "based upon" in the Act is a journey into the netherworld of statutory construction requiring an analysis of the *allegedly* "plain meaning" of the term, as well as an exploration of the policy rationales which shaped the Act. Not surprisingly, the definition and construction of the term "based upon" differs among the circuits. The Eighth Circuit has yet to define the term. Thus, unguided by controlling precedent in this close and complicated question, this Court must offer its interpretation of the [*22] term "based upon."

Several Circuits have concluded that the phrase "based upon" applies whenever the complaint describes allegations or transactions "substantially similar to those in the public domain." *United States of America, ex rel.*



1997 U.S. Dist. LEXIS 21402, *

*D.J., Findley v. FPC-Boron Employees' Club, et al.,* 323 *U.S. App. D.C.* 61, 105 *F.3d* 675, 1997 *WL* 24258 *at* 6 (*D.C. Cir.* 1997); *United States ex rel. Precision Co. v. Koch Indus., Inc.,* 971 *F.2d* 548, 552 (10th *Cir.* 1992). The Tenth Circuit explained the definition and test for "based upon" in the following manner: "'Based upon,' [in the Act] means 'supported by.' The test is whether 'substantial identity' exists between the publicly disclosed allegations and the *qui tam* complaint." *United States of America, ex. rel., Fine v. MK-Ferguson Co.,* 99 *F.3d* 1538, 1545 (10th *Cir.* 1996) (citing *Precision,* 971 *F.2d at* 552). This analysis applies regardless of the actual source of the information in the public disclosure/complaint. *Findley* 1997 *WL* 24258 *at* 4. The Court in Fine reasoned that "where public disclosure of the fraud has already occurred, no incentive for a private *qui tam* suit is needed." 99 *F.3d at* 1546.

The Fourth [*23] Circuit envisioned a different definition of the term "based upon." *United States ex rel. Siller v. Becton Dickinson & Co.,* 21 *F.3d* 1339, 1348 (4th *Cir.* 1994). In Siller, the Court determined that the term means "derived from." Id. As such, "a relator's action is 'based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based." Id. (emphasis added). Concomitantly, that the facts publicly disclosed and the facts of the action are the same does not mean that the relator actually derived his allegations from the publicly disclosed facts. Id. The Court in Siller reasoned that this understanding of the term "based upon" is consistent with the objective of preventing opportunistic and parasitic actions. Id. The Siller Court also criticized that other Circuits' definitions of "based upon" failed to reconcile their understanding of the phrase "based upon" with the phrases's plain meaning. *Id. at 1349.* The Siller Court specifically criticized the definition "supported by" as used by the Court in Precision by maintaining that no common usage [*24] or dictionary definition implies that "based upon" could mean "supported by." Id.

The D.C. Circuit recently carefully analyzed the issue of the term "based upon" in light of Siller. See e.g. *Findley,* 1997 *WL* 24258. The Court in Findley found the definition of "based upon" used by the Siller Court acceptable, but nevertheless believed the "derived from" definition was ultimately inappropriate in light of the structure of the entire False Claims Act. Id. at 7. The Findley Court specifically raised the concern that interpreting "based upon" to mean "derived from" rendered the "original source" exception to the public disclosure bar extraneous. Id. In order to give effect to all parts of the Act, the Court in Findley endorsed the "similarly situated" test.

This Court finds the reasoning of the Siller decision preferable to the rationale of the Court in Findley. n8 The definition of "derived from" is logically closer to "based upon" than "supported by." More specifically, it is the execution of the definition "supported by" to mean "same as" or "similarly situated" that is difficult to reconcile with the plain meaning of the term "based upon." As [*25] the Court in Siller taught, the definition of "based upon," according to Webster's Third New International Dictionary, n9 180 (1986) (definition no. 2), means to "use as a basis for." This could mean "derived from" as well as "supported by," but most importantly it does not mean "same." n10 By way of example: "based upon" means that X is *used* in order to formulate Y. If Y can completely exist independently of X, then Y is not "based upon" X.

n8 The proceeding discussion of the term "based upon" does not speak to, nor negate, the idea that "based upon" can mean "based upon in part."

n9 The Judicial Opinion Writing Manual, American Bar Association (1991) p. 38, references that this dictionary "has long been the standard."

n10 The fact that a complaint is "similarly situated" to a public disclosure could be a useful indication that a complaint is based upon that public disclosure. However, the existence of similarities does not conclusively establish that the complaint was "based upon" the information in the public domain.

[*26]

In the present case before the Court, Plaintiffs did not "use" the antitrust complaint (X) to create the qui tam complaint (Y). Rather, both the antitrust complaint and the qui tam complaint are based upon (i.e. derived from, supported by, uses) Plaintiffs' own knowledge. Plaintiffs could have brought forth the allegations contained in the qui tam complaint independent of the information alleged in the antitrust action. Accordingly, Plaintiffs' complaint is not "based upon" publicly disclosed information so as to raise the jurisdictional bar. n11

n11 The criticism by the Court in Findley which claimed that the "derived from" type of a definition renders the "original source" exception superfluous is an intriguing and troublesome issue. However, the analysis in Findley pre-surmises a certain interpretation of the "original source" exception, and in any event, it does not persuade




1997 U.S. Dist. LEXIS 21402, *

this Court to abandon the plain meaning of the term "based upon."

This conclusion is supported by the fundamental [*27] policies of the statute. The goals of the Act are to encourage "private citizen involvement in exposing fraud against the Government while preventing opportunistic suits by private persons who became aware of fraud but played no part in exposing it." *Barth, 44 F.3d at 702.* A relator who did not use the information from publicly disclosed material for the complaint is not an opportunistic plaintiff who must be barred from bringing suit. Rather, that relator is a private citizen with fraudulent information and should be encouraged to come forward.

Furthermore, it is notable that part of the reasoning behind other courts' "same as" analysis appears to be that the "original source" exception is an adequate safeguard for non-opportunistic relators. However, this is not always the case. For example, a relator may file a complaint similar to publicly disclosed information. This relator may prove that she did not use the public information in formulating her complaint, but rather that she was independently knowledgeable of fraudulent information and was even exposing new fraudulent information. Nevertheless, under a "same as" test she must prove she was an original source. If she did [*28] not present her information to the Government before the public disclosure, then she may not qualify as an original source. As such, a relator who had information concerning a fraud, and who was not a parasitic Plaintiff; is deprived of the opportunity to bring suit. A result such as this does not promote the twin goals of the Act. A definition of "based upon" other than "same as" saves certain relators who may not qualify for the "original source" exception.

In conclusion, this Court finds that Plaintiffs based the qui tam complaint upon their own knowledge, n12 and not upon publicly disclosed information. Accordingly, the Act's jurisdiction requirements do not deprive this Court of jurisdiction over Plaintiffs' complaint.

n12 This finding is possible in this specific instance because Plaintiffs in the qui tam action are the same parties that exposed the publicly disclosed information.

## C)   COMPLIANCE   WITH   FILING PROCEDURES

Defendants also contend that Plaintiffs failed to comply with the filing [*29] procedures of the Act. Section 3730(b)(2) requires:

A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government... The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

Defendants do not contend that Plaintiffs failed to file the complaint under seal and provide the Government with a statement of material evidence. n13 Rather, Defendants argue that Plaintiffs' disclosures to the Government were insufficient because the disclosures did not contain information as to each of the defendants, especially with respect to Defendants added in the amended complaints.

n13 Plaintiffs produced to all Defendants the documents included in its "Statement of Material Evidence" to the Government on May 7, 1996. (Graham Aff. P 3).

[*30]

The statutory scheme seems to inherently contemplate that new information - such as the addition of claims or defendants - may occur as the case progresses. First, the statute does not call for *all* the information to be disclosed. Rather, according to the statute, a relator need only furnish *"substantially* all" the information in their *possession.* Second, as a plaintiff adds claims or defendants, the Government can still intervene in the case at a later date for good cause shown under § 3730(c)(3); *United States ex rel. Mikes v. Straus, 931 F. Supp. 248, 261 (S.D.N.Y. 1996).* The intent of the filing provision is to allow the Government an opportunity to evaluate the allegations and determine if the Government should intervene. *Pilon v. Martin Marietta Corp., 60 F.3d 995, 998 (2nd Cir. 1995).* As such, a material statement to the Government that does not recite every defendant but still fulfills the purpose of informing the Government about the fraudulent activity sufficient to conduct an investigation, fulfills the filing provision. See e.g. *Mikes, 931 F. Supp. at 259* (the statute does not require a plaintiff follow the filing procedure for amended complaints); [*31] see also *United States v. Regents of University of California, 912 F. Supp. 868, 890 (D.Md. 1995).*

In the present case, Plaintiffs provided the Government with a statement of material evidence when filing the first complaint. This statement of material



1997 U.S. Dist. LEXIS 21402, *

evidence provided the Government an opportunity to investigate the *type* of fraud alleged, even if not every defendant was specifically named. Since the Government had an opportunity to conduct an adequate investigation and determine whether or not to intervene, Plaintiffs complied with the filing provisions of the Act.

## II. PARTICULARITY OF THE COMPLAINT

Defendants assert that Plaintiffs' complaint fails to plead the allegations of fraud with sufficient particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. Plaintiffs argue that given the extensive nature of the fraud - over 28,000 fraudulent bills throughout a six year period - the complaint need not detail every alleged instance of fraud. Under these circumstances, Plaintiffs maintain that their complaint pleads sufficient detail to place Defendants on notice.

Federal Rule of Civil Procedure 9(b) requires, in part, that "in all averments of [*32] fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The purposes of the Rule are to: (1) prevent a complaint from being filed merely as a pretext for discovery of unknown wrongs; (2) protect defendants from suffering the harm which results from charges of wrongdoing; and (3) give defendants notice of the fraud alleged sufficient to respond and prepare a defense to the allegations. Id. Rule 9(b) applies to allegations of fraud brought under the False Claims Act. *United States v. Napco Intern., Inc., 835 F. Supp. 493, 495 (D.Minn. 1993)* (citations omitted). A court must focus its analysis only on the complaint itself and should not consider supporting documents when deciding a Rule 9(b) motion. *Daher v. G.D. Searle & Co., 695 F. Supp. 436, 440 (D.Minn. 1988).*

"Circumstances" of the fraud include "'time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" *Commercial Property v. Quality Inns, 61 F.3d 639, 644 (8th Cir. 1995)* (citing *Bennett v. Berg, 685 F.2d 1053, 1062 (8th Cir. 1982)).* Allegations of fraud which [*33] are merely conclusory are insufficient to satisfy Rule 9(b). *Commercial Property, 61 F.3d at 644.* Less specificity in the complaint can be permitted when the fraudulent activity involves numerous transactions or the fraud occurred over a long period of time. *Terrell v. Childers., 836 F. Supp. 468, 475 (N.D.Ill. 1993).* However, even in those instances, the complaint must set forth details of the alleged fraud. Id.

Plaintiffs' complaint in the present case fails to provide the sufficient level of specificity to comply with Rule 9(b). Plaintiffs' complaint sketches the general fraudulent scheme that Defendants allegedly perpetrated.

In describing the fraudulent activity, the complaint generically references the Defendants as "defendant anesthesiologists," "defendant hospitals" or even as "various defendant hospitals."

The Court recognizes that Plaintiffs allege a general practice of fraud that covers an extensive period of time. Clearly Plaintiffs are not required to recite specifics for all 28,000 allegedly fraudulent transactions. Nevertheless, Plaintiffs must provide some representative examples of the fraud which detail the specifics of who, where and when. Plaintiffs [*34] complaint does not once describe a single instance of the fraudulent conduct that names a specific anesthesiologist on an exact date at a particular hospital with reference to either the procedure, patient or bill. Failure to plead *no* specifics is insufficient to satisfy Rule 9(b), even given a lesser pleading standard for allegations of extensive fraud. Plaintiffs' complaint must be dismissed for failure to comply with Rule 9(b).

## III. RULE 12(b)(6) MOTIONS

A lack of particularity in the complaint also impedes the Court's ability to evaluate the 12(b)(6) motions. Accordingly, given the determination regarding the specificity of the complaint, the Court will defer consideration of Defendants' motions to dismiss based upon Rule 12(b)(6). Defendants may renew their 12(b)(6) motions if Plaintiffs file a new complaint which satisfies the requirements of Rule 9 of the Federal Rules of Civil Procedure. Ideally, an amended complaint will provide more clarity of the allegations which in turn will assist this Court in evaluating the 12(b)(6) issues.

### CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY** [*35] **ORDERED** that:

1. Defendants' motions to dismiss for lack of subject matter jurisdiction are **DENIED.** The Court has jurisdiction over this matter;

2. Defendants' motions to dismiss for failure to plead with particularity as pursuant to Federal Rule of Civil Procedure 9(b), are **GRANTED;**

3. Plaintiffs' complaint is **DISMISSED WITHOUT PREJUDICE.** Plaintiffs are given leave to file an amended complaint within 20 days; and

4. Defendants' motions to dismiss based upon Rule 12(b)(6) are **DENIED WITHOUT PREJUDICE.**

Ann D. Montgomery

UNITED STATES DISTRICT COURT

Dated: March 3, 1997